EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BOSTON SCIENTIFIC CORP. and<br>BOSTON SCIENTIFIC NEUROMODULATION<br>CORP., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 16-1163 (GMS) |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| NEVRO CORP., | ) ) ) | REDACTED - PUBLIC VERSION |
| Defendant. | ) | |

### NEVRO CORP.'S AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS TO BOSTON SCIENTIFIC CORP. AND BOSTON SCIENTIFIC NEUROMODULATION CORP.'S <u>FIRST AMENDED COMPLAINT</u>

Defendant Nevro Corp. ("Nevro"), by and through its undersigned counsel,

hereby submits this Amended Answer, Defenses and Counterclaims to the First Amended

Complaint of Plaintiffs Boston Scientific Corp. ("BSC") and Boston Scientific Neuromodulation

Corp. ("BSNC") (collectively, "Boston Scientific") (D.I. 13).  Pursuant to Federal Rule of Civil

Procedure 8(b)(3), Nevro denies each and every allegation in Boston Scientific's First Amended

Complaint except those expressly admitted below.

### <u>OVERVIEW OF THE ACTION</u>

1.      Nevro admits that this is a patent infringement action.  Nevro denies any

remaining allegations in this paragraph.

### <u>THE PARTIES</u>

2.      Admitted.

3.      Nevro admits that BSNC is a Delaware corporation with its principal place

of business at 25155 Rye Canyon Loop, Valencia, California 91355.  Nevro lacks sufficient

knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

4.      Admitted.

## JURISDICTION AND VENUE

5.      Admitted.

6.      Nevro admits that this Court has subject matter jurisdiction over the patent infringement claims asserted in Boston Scientific's First Amended Complaint under 28 U.S.C. §§ 1331 and 1338(a).  Nevro denies any remaining allegations in this paragraph.

7.      Nevro admits that this Court has personal jurisdiction over Nevro for purposes of this litigation.  Nevro denies any remaining allegations in this paragraph.

8.      Nevro admits that venue is proper in this District for purposes of this litigation.

## BOSTON SCIENTIFIC'S BACKGROUND

9.      Nevro admits that Boston Scientific is a medical device manufacturer and that Boston Scientific sells Spinal Cord Stimulation ("SCS") systems for the treatment of chronic pain.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

10.      Nevro admits, on information and belief, that Boston Scientific sells SCS systems that include the term "Precision" in the product name.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

11.      Nevro denies that Boston Scientific developed and patented core technologies that are essential to SCS systems, and that Boston Scientific's technologies form the foundation of every SCS system on the market, including Nevro's Senza® System.  Nevro lacks

sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

12.     Nevro admits that its Senza® system is as described in documents submitted by Nevro to the FDA and SEC, but denies this paragraph to the extent it is inconsistent or incomplete with respect to those documents.  Otherwise, admitted.

13.     Nevro denies that it launched the Senza® system in Europe and Australia in the same year.  Nevro admits that the Senza® system launched in Europe in 2010 and in Australia in 2011.  Otherwise, admitted.

14.     Nevro admits that C.C.C. Del Uruguay S.A. ("CCC") is a manufacturer of Nevro's implantable pulse generators ("IPG"), trial simulators, and programmer wands.  Nevro denies that CCC is currently Nevro's single-source manufacturer of its IPG.  Nevro denies that CCC currently manufactures Nevro's external chargers.  Nevro admits that CCC has a manufacturing facility in Montevideo, Uruguay.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

15.     Nevro admits that Stellar Technologies, Inc. is the single-source supplier of Nevro's percutaneous leads.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

16.     Nevro admits that EaglePicher Medical Power LLC is currently the single-source supplier of batteries for Nevro's IPG.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

17.     Nevro admits that Pro-Tech Design and Manufacturing, Inc. ("Pro-Tech") is the single-source supplier for conducting the inspection, labeling, packaging and sterilization of Nevro's Senza® system.  Nevro admits that Pro-Tech's tender of the Senza® system for delivery, FCA (Incoterms 2000) includes Pro-Tech's Santa Fe Springs, California facility. Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

## BOSTON SCIENTIFIC'S PRE-SUIT INVESTIGATION

18.     Nevro denies that the Senza® system infringes the technology claimed in the Asserted Patents.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

## NEVRO'S KNOWLEDGE OF THE ASSERTED PATENTS

19.     Nevro admits that it received copies of the Asserted Patents at least upon service of the original Complaint.  Nevro denies any remaining allegations in this paragraph.

20.     Nevro admits that it participated in an FDA-monitored randomized controlled trial in a head-to-head comparison against Boston Scientific's Precision™ SCS system in which Nevro's Senza® system and paresthesia-free HF10™ therapy was determined by the FDA to be clinically superior to Boston Scientific's Precision SCS system.  Nevro admits that its February 29, 2016 Form 10-K filing contains the statement quoted in this paragraph. Nevro denies any remaining allegations in this paragraph.

21.     Nevro admits that Boston Scientific filed two Petitions for *Inter Partes* Review of Nevro's U.S. Patent No. 8,359,102 in May 2015, which were subsequently denied institution by the Patent Trial and Appeal Board in November 2015.  Nevro admits that it filed a Complaint for Patent Infringement and Declaratory Judgment against Boston Scientific in the United States District Court for the Northern District of California in November 2016, for

4

Boston Scientific's willful infringement of Nevro's patents directed to Nevro's FDA-approved superior HF10$^{TM}$ therapy.  Nevro admits that it conducted a pre-suit investigation into Boston Scientific's infringing activities with respect to Nevro's patents asserted in that action prior to initiating the lawsuit against Boston Scientific.  Nevro lacks sufficient knowledge or information regarding other companies' practices with respect to competitive intelligence and pre-suit investigations, and on that basis denies the allegation.  Nevro denies any remaining allegations in this paragraph.

   22. Nevro admits that Kerry Bradley is currently the Senior Director of Clinical Science & Research at Nevro.  Nevro admits that Mr. Bradley previously worked for Boston Scientific.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations concerning Mr. Bradley's prior employment before Nevro, and on that basis denies those allegations.  Nevro denies any remaining allegations in this paragraph.

   23. Nevro admits that Jim Thacker is currently the Senior Director of Clinical Engineering at Nevro.  Nevro admits that Mr. Thacker previously worked for Boston Scientific. Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations concerning Mr. Thacker's prior employment before Nevro, and on that basis denies those allegations.  Nevro denies any remaining allegations in this paragraph.

   24. Nevro admits that Dongchul Lee is currently the Director of Theoretical Research at Nevro.  Nevro admits that Mr. Lee previously worked for Boston Scientific.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations concerning Mr. Lee's prior employment before Nevro, and on that basis denies those allegations.  Nevro denies any remaining allegations in this paragraph.

25.     Nevro lacks sufficient knowledge or information to admit or deny the allegations concerning Messrs. Bradley, Thacker, and Lee's prior employment or their extensive knowledge, and on that basis denies those allegations.  Nevro denies any remaining allegations in this paragraph.

26.     Nevro denies that Anthony Puglisi, Brian Warriner, and Danielle Pronesti are current employees of Nevro.  Nevro admits that Lisa Earnhardt is a member of Nevro's Board of Directors.  Nevro admits that the following are current employees at Nevro:  Doug Alleavitch, Vice President, Quality; Reynaldo Nossa, Director of Technical Services & Support; Andreas Koenig, Sr. Clinical Affairs Manager; David Marco, Principal Field Clinical Engineer; Tamara Baynham, Sr. Field Clinical Engineer; Dan Hestera, Regional Sales Director; Jeff Orr, Regional Sales Director; Jim Sackleh, Regional Sales Director; Richard James, Regional Sales Director; Angela Holley, District Sales Manager; Laurie Cigan, District Sales Manager; Heather Moss-Gad, District Sales Manager; Cable Hawkins, District Sales Manager; Matt Goldstone, District Sales Manager; Philip Almeida, District Sales Manager; Ryan Livingston, District Sales Manager; Christopher White, District Sales Manager; Lindsay Molden, District Sales Manager; Christine Biello, District Sales Manager; Chad Sellers, District Sales Manager; Randall Scott Shoultz, District Sales Manager; Croix Paquin, District Sales Manager; Ashley Bailey, Therapy Consultant; Mandy Cash, Therapy Consultant; Gretchen Thomas, Therapy Consultant; Will Windauer, Therapy Consultant; Kate Ginter, Therapy Optimization Specialist; and Kelly Engle, Therapy Support Specialist.  Nevro lacks sufficient knowledge or information to admit or deny the allegations concerning these individuals' employment before Nevro, and on that basis denies those allegations.  Nevro denies any remaining allegations in this paragraph.

27.     Nevro admits that the '280 patent is listed on the faces of U.S. Patent Nos. 9,403, 013; 8,849,410; 8,255,057; 8,509,906; 9,399,137; 9,409,019; 9,295,840; and 9,517,344, which are assigned to Nevro.  Nevro admits that Mr. Thacker is an inventor of U.S. Patent No. 9,295,840.  Nevro admits that Mr. Thacker was previously an employee of Boston Scientific.  Nevro admits that Mr. Bradley is an inventor of U.S. Patent 9,517,344.  Nevro admits that Mr. Bradley was previously an employee of Boston Scientific.  Nevro denies any remaining allegations in this paragraph.

28.     Nevro admits that the '193 patent is listed on the faces of U.S. Patent Nos. 9,227,076; 9,409,020; and 9,517,344, which are assigned to Nevro.  Nevro admits that Mr. Bradley is an inventor of U.S. Patent No. 9,517,344.  Nevro admits that Mr. Bradley was previously an employee of Boston Scientific.  Nevro admits that according to the face of the '241 patent, the '193 patent is a parent of the '241 patent.  Nevro denies any remaining allegations in this paragraph.

29.     Nevro admits that the '439 patent is listed on the faces of U.S. Patent Nos. 9,403,020; 8,805,519; 9,358,388; 9,345,891; 8,965,482; and 9,308,022.  Nevro admits that Mr. Thacker is an inventor of U.S. Patent Nos. 8,805,519; 9,358,088; 9,345,891; and 8,965,482.  Nevro admits that Mr. Thacker was previously an employee of Boston Scientific.  Nevro admits that according to its face, the '439 patent is the child of the '085 patent.  Nevro denies any remaining allegations in this paragraph.

30.     Nevro admits that certain of the Asserted Patents are listed on the face of certain of Nevro's patents.  Nevro denies any remaining allegations in this paragraph.

31.     Nevro admits that certain of the Asserted Patents are listed on the face of certain of Nevro's patents.  Nevro denies any remaining allegations in this paragraph.

32.     Denied.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 6,895,280**

33.     Nevro incorporates by reference each of its answers to Paragraphs 1-32 above as if fully set forth herein.

34.     Nevro admits that the '280 patent is titled "Rechargeable Spinal Cord Stimulator System," and identifies May 17, 2005 as the patent issue date on its face.  Nevro admits that Exhibit A appears to be a copy of the '280 patent.  Nevro denies that the '280 patent is valid and enforceable and denies any remaining allegations in this paragraph.

35.     Nevro lacks sufficient knowledge or information to admit or deny the allegations in this paragraph, and on that basis denies those allegations.

36.     Nevro admits that the claims of the '280 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

37.     Denied.

38.     Denied.

39.     Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

40.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

41.     Denied.

42.     Nevro admits that it sells the Senza® system to health care providers. Nevro denies any remaining allegations in this paragraph.

43.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

44.     Nevro admits that it was aware of the '280 patent prior to the filing of the original Complaint.  Nevro denies any remaining allegations in this paragraph.

45.     Denied.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 7,428,438

46.     Nevro incorporates by reference each of its answers to Paragraphs 1-45 above as if fully set forth herein.

47.     Nevro admits that the '438 patent is titled "Systems And Methods For Providing Power To A Battery In An Implantable Stimulator," and identifies September 23, 2008 as the patent issue date on its face.  Nevro admits that Exhibit B appears to be a copy of the '438 patent.  Nevro denies that the '438 patent is valid and enforceable and denies any remaining allegations in this paragraph.

48.     Nevro admits that the '438 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

49.     Nevro admits that the claims of the '438 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

50.     Denied.

51.     Denied.

52.     Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

53.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

54.     Denied.

55.     Nevro admits that it sells the Senza® system to health care providers. Nevro denies any remaining allegations in this paragraph.

56.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

57.     Denied.

58.     Denied.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 7,437,193

59.     Nevro incorporates by reference each of its answers to Paragraphs 1-58 above as if fully set forth herein.

60.     Nevro admits that the '193 patent is titled "Microstimulator Employing Improved Recharging Reporting And Telemetry Techniques," and identifies October 14, 2008 as the patent issue date on its face.  Nevro admits that Exhibit C appears to be a copy of the '193 patent.  Nevro denies that the '193 patent is valid and enforceable and denies any remaining allegations in this paragraph.

61.     Nevro admits that the '193 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

62.     Nevro admits that the claims of the '193 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

63.     Denied.

64.     Denied.

65.     Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

66.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

67.     Denied.

68.     Nevro admits that it sells the Senza® system to health care providers. Nevro denies any remaining allegations in this paragraph.

69.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

70.     Denied.

71.     Denied.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 7,587,241

72.     Nevro incorporates by reference each of its answers to Paragraphs 1-71 above as if fully set forth herein.

73.     Nevro admits that the '241 patent is titled "Method For Controlling Telemetry In An Implantable Medical Device Based On Power Source Capacity," and identifies September 8, 2009 as the patent issue date on its face.  Nevro admits that Exhibit D appears to be a copy of the '241 patent.  Nevro denies that the '241 patent is valid and enforceable and denies any remaining allegations in this paragraph.

74.     Nevro admits that the '241 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

75.     Nevro admits that the claims of the '241 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph

76.     Denied.

77.     Denied.

78.     Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

79.     Denied.

80.     Nevro admits that it sells the Senza® system to health care providers. Nevro denies any remaining allegations in this paragraph.

81.     Denied.

82.     Denied.

**COUNT V: INFRINGEMENT OF U.S. PATENT NO. 7,891,085**

83.     Nevro incorporates by reference each of its answers to Paragraphs 1-82 above as if fully set forth herein.

84.     Nevro admits that the '085 patent is titled "Electrode Array Assembly And Method Of Making Same," and identifies February 22, 2011 as the patent issue date on its face. Nevro admits that Exhibit E appears to be a copy of the '085 patent.  Nevro denies that the '085 patent is valid and enforceable and denies any remaining allegations in this paragraph.

85.     Nevro admits that the '085 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

86.     Nevro admits that the claims of the '085 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

87.     Denied.

88.     Denied.

89.     Denied.

90.     Nevro admits that it was aware of the '085 patent prior to the filing of the original Complaint.  Nevro denies any remaining allegations in this paragraph.

91.     Denied.

## COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 8,019,439

92.     Nevro incorporates by reference each of its answers to Paragraphs 1-91 above as if fully set forth herein.

93.     Nevro admits that the '439 patent is titled "Lead Assembly And Method of Making Same," and identifies September 13, 2011 as the patent issue date on its face.  Nevro admits that Exhibit F appears to be a copy of the '439 patent.  Nevro denies that the '439 patent is valid and enforceable and denies any remaining allegations in this paragraph.

94.     Nevro admits that the '439 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

95.     Nevro admits that the claims of the '439 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

102.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

103.     Nevro admits that it was aware of the '439 patent prior to the filing of the original Complaint.  Nevro denies any remaining allegations in this paragraph.

104.     Denied.

### COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 8,644,933

105.     Nevro incorporates by reference each of its answers to Paragraphs 1-104 above as if fully set forth herein.

106.     Nevro admits that the '933 patent is titled "Techniques For Controlling Charging Of Batteries In An External Charger And An Implantable Medical Device," and identifies February 4, 2014 as the patent issue date on its face.  Nevro admits that Exhibit G appears to be a copy of the '933 patent.  Nevro denies that the '933 patent is valid and enforceable and denies any remaining allegations in this paragraph.

107.     Nevro admits that the '933 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

108.     Nevro admits that the claims of the '933 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

109.     Denied.

110.     Denied.

111.     Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

112.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

113.     Denied.

114.     Nevro admits that it sells the Senza® system to health care providers. Nevro denies any remaining allegations in this paragraph.

115.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

116.     Denied.

117.     Denied.

### COUNT VIII: INFRINGEMENT OF U.S. PATENT NO. 8,646,172

118.     Nevro incorporates by reference each of its answers to Paragraphs 1-117 above as if fully set forth herein.

119.     Nevro admits that the '172 patent is titled "Electrode Array Assembly And Method Of Making Same," and identifies February 11, 2014 as the patent issue date on its face. Nevro admits that Exhibit H appears to be a copy of the '172 patent.  Nevro denies that the '172 patent is valid and enforceable and denies any remaining allegations in this paragraph.

120.     Nevro admits that the '172 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

121.     Nevro admits that the claims of the '172 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

122.     Denied.

123.     Denied.

124.     Denied.

125.     Nevro admits that it was aware of the '172 patent prior to the filing of the original Complaint.  Nevro denies any remaining allegations in this paragraph.

126.     Denied.

**COUNT IX: INFRINGEMENT OF U.S. PATENT NO. 8,650,747**

127.     Nevro incorporates by reference each of its answers to Paragraphs 1-126 above as if fully set forth herein.

128.     Nevro admits that the '747 patent is titled "Electrode Array Assembly And Method Of Making Same," and identifies February18, 2014 as the patent issue date on its face. Nevro admits that Exhibit I appears to be a copy of the '747 patent.  Nevro denies that the '747 patent is valid and enforceable and denies any remaining allegations in this paragraph.

129.     Nevro admits that the '747 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

130.     Nevro admits that the claims of the '747 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

131.     Denied.

132.     Denied.

133.     Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

134.     Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

135.     Nevro admits that it was aware of the '747 patent prior to the filing of the original Complaint.  Nevro denies any remaining allegations in this paragraph.

136.    Denied.

**COUNT X: INFRINGEMENT OF U.S. PATENT NO. 9,370,664**

137.    Nevro incorporates by reference each of its answers to Paragraphs 1-136 above as if fully set forth herein.

138.    Nevro admits that the '664 patent is titled "Signaling Error Conditions In An Implantable Medical Device System Using Simple Charging Coil Telemetry," and identifies June 21, 2016 as the patent issue date on its face.  Nevro admits that Exhibit J appears to be a copy of the '664 patent.  Nevro denies that the '664 patent is valid and enforceable and denies any remaining allegations in this paragraph.

139.    Nevro admits that the '664 patent identifies BSNC as the patent assignee on its face.  Nevro lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph, and on that basis denies those allegations.

140.    Nevro admits that the claims of the '664 patent include the elements recited in each respective claim.  Nevro denies any remaining allegations in this paragraph.

141.    Denied.

142.    Denied.

143.    Nevro admits that it provides physician and patient manuals on the Senza® system and that Nevro field representatives are present in the operating room when a Senza® system is implanted.  Nevro denies any remaining allegations in this paragraph.

144.    Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

145.    Denied.

146.    Nevro admits that it sells the Senza® system to health care providers.  Nevro denies any remaining allegations in this paragraph.

147.    Nevro admits that the Senza® system is exported from the United States to Europe and Australia.  Nevro denies any remaining allegations in this paragraph.

148.    Denied.

149.    Denied.

## ANSWER TO PLAINTIFFS' PRAYER FOR RELIEF

Nevro denies that Boston Scientific is entitled to any of the relief requested.

## JURY DEMAND

Nevro acknowledges that the Complaint sets forth a demand for a jury trial.

## NEVRO'S AFFIRMATIVE DEFENSES

Without any admission as to the burden of proof, Nevro asserts the following defenses.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

150.    Boston Scientific's First Amended Complaint fails to state a claim upon which relief can be granted, for any of the Asserted Patents.

## SECOND AFFIRMATIVE DEFENSE
### (Noninfringement)

151.    Nevro has not directly infringed, and is not directly infringing, any valid and enforceable claims of the Asserted Patents either literally or under the doctrine of equivalents.  Nevro has not induced or contributed to, and is not inducing or contributing to, infringement of any valid and enforceable claims of the Asserted Patents either literally or under the doctrine of equivalents.  Nevro has not engaged in, and is not engaging in, export infringement under either 35 U.S.C. §§ 271(f)(1) or (2) of any valid and enforceable claims of the Asserted Patents either literally or under the doctrine of equivalents.

## THIRD AFFIRMATIVE DEFENSE
### (Invalidity)

152.    The claims of the Asserted Patents are invalid under the provisions of 35

U.S.C. §§ 100 *et seq.*, including but not limited to §§ 101, 102, 103, and 112.

## FOURTH AFFIRMATIVE DEFENSE
### (Obviousness-Type Double Patenting)

153.    One or more claims of the Asserted Patents is invalid under the judicially-

created doctrine of obviousness-type double patenting, including but not limited to claims of the

'085, '439, '172, and '747 patents.

## FIFTH AFFIRMATIVE DEFENSE
### (Waiver and Estoppel)

154.    Boston Scientific's First Amended Complaint is barred by the doctrines of

waiver and/or estoppel.

## SIXTH AFFIRMATIVE DEFENSE
### (Incorrect Inventorship/Derivation)

155.    The '085, '439, '172, and '747 patents are invalid under at least the

provisions of pre-AIA § 102(f).

## SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

156.    BSC lacks standing to assert the '085, '439, '172, and '747 patents due to

incorrect inventorship and lack of proper license.

## EIGHTH AFFIRMATIVE DEFENSE
### (License)

157.    Boston Scientific's allegations of infringement of the '085, '439, '172, and

'747 patents are barred in whole or in part by the defense of license (either express or implied).

## NINTH AFFIRMATIVE DEFENSE
### (Exhaustion)

158.    Boston Scientific's allegations of infringement of the '085, '439, '172, and '747 patents are barred in whole or in part by the defense of patent exhaustion.

## TENTH AFFIRMATIVE DEFENSE
### (Laches)

159.    Boston Scientific's First Amended Complaint is barred by the doctrine of laches.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Prosecution Laches)

160.    One or more of the Asserted Patents is unenforceable under the doctrine of prosecution laches.

## TWELFTH AFFIRMATIVE DEFENSE
### (No Willful Infringement)

161.    Nevro has not willfully infringed, and is not willfully infringing, any valid and enforceable claims of the Asserted Patents.  Boston Scientific is not entitled to seek enhanced damages or attorneys' fees for willful infringement.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Limitation on Damages)

162.    Boston Scientific's claims for damages, if any, are statutorily limited by 35 U.S.C. § 286 and/or § 287.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Limitation on Costs)

163.    To the extent that any claim of any asserted patent is invalid, Boston Scientific is barred by 35 U.S.C. § 288 from recovering costs associated with its action.

**FIFTEENTH AFFIRMATIVE DEFENSE**
**(Unenforceability Due to Inequitable Conduct)**

164.    For the reasons set forth in Nevro's Counterclaims below, which are incorporated herein by reference, the '280 patent is unenforceable due to inequitable conduct committed by the named inventors and Boston Scientific's attorneys.

**NEVRO'S COUNTERCLAIMS**

165.    Counterclaimant Nevro by and through its undersigned counsel seeks a declaration and judgment that U.S. Patent No. 6,895,280 ("the '280 patent") and its parent, U.S. Patent No. 6,516,227 ("the '227 patent"), are unenforceable due to inequitable conduct before the United States Patent and Trademark Office ("Patent Office") by persons substantively involved  with the prosecution of the '280 patent and '227 patent.

**NATURE OF THE ACTION**

166.    This is a declaratory judgment action.  The '280 and '227 patents are unenforceable due to inequitable conduct before the Patent Office by persons substantively involved with their prosecution.

**THE PARTIES**

167.    Counterclaimant Nevro is a Delaware corporation with its principal place of business at 1800 Bridge Pkwy, Redwood City, CA 94065.

168.    Counter-defendant Boston Scientific Corp. ("BSC") is a Delaware corporation with its principal place of business at 300 Boston Scientific Way, Marlborough, MA 01752, and counter-defendant and Boston Scientific Neuromodulation Corp. ("BSNC") is a Delaware corporation with its principal place of business at 25155 Rye Canyon Loop, Valencia, California 91355. BSNC operates as a wholly-owned subsidiary of BSC, acts at BSC's direction

and control and for BSC's direct benefit, and is controlled by BSC.  Collectively, BSC and

BSNC are referred to herein as "BSC" or "Boston Scientific."

## JURISDICTION AND VENUE

169.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

and 1338(a).

170.    This Court has personal jurisdiction over BSC and BSNC because they are

Delaware corporations and because they initiated litigation in this judicial District in connection

with this dispute.

171.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b) in

that Boston Scientific is subject to personal jurisdiction in this District. In addition, Boston

Scientific has submitted to the jurisdiction of this District by filing the present lawsuit.

## FIRST CLAIM FOR RELIEF
### (Unenforceability Due to Inequitable Conduct in Connection With the Prosecution of the '280 Patent and its Parent Application)

172.    Based on the filing of this action, Boston Scientific's ownership interest in

the '280 patent and Nevro's Affirmative Defenses, an actual controversy has arisen and now

exists between Plaintiffs and Nevro as to the enforceability of the '280 and '227 patents.

173.    The '280 patent is unenforceable because individuals having substantive

involvement in the prosecution of applications leading to the issuance of the '280 patent (i) knew

of multiple prior art references not disclosed to the Examiner of the '280 and '227 patent,

(ii) knew that these prior art references were material to patentability, and (iii) with specific

intent to deceive the Patent Office, made a deliberate decision to withhold these references from

the Patent Office in connection with the prosecution of the '227 and '280 patents.  The Patent

Office would not have allowed one or more claims of the '227 and '280 patents had it been

aware of the withheld prior art.  These individuals included Bryant R. Gold, the in-house

prosecuting attorney and Chief Patent Counsel for the original assignee Advanced Bionics Corporation (which was later acquired by BSC) (hereinafter collectively referred to as "Boston Scientific"), named inventors Paul Meadows and Joey Chen, and possibly others.

174.    More particularly, at least Messrs. Gold, Meadows and Chen knowingly withheld material and non-cumulative prior art, including U.S. Patent No. 5,411,537 ("Munshi"), U.S. Patent No. 5,560,693 ("Wang"), U.S. Patent No. 5,733,313 ("Barreras") and U.S. Patent No. 6,067,474 ("Schulman") (hereafter, the "withheld references") from the Patent Office. Messrs. Gold, Meadows, Chen and/or others also made material misrepresentations to the Patent Office regarding the novelty of the '227 patent and the state of the prior art.

175.    The Munshi, Wang, Barreras and Schulman references alone or in combination with other references disclose or suggest each and every element of at least claims 1, 2, 17, and 18 of the '227 patent and claims 8, 18, 22-24, and 27 of the '280 patent thus anticipating these claims or rendering them obvious.  Had the Patent Office been made aware of these references during prosecution of the '227 and '280 patents, at least claims 1, 2, 17, and 18 of the '227 patent and claims 8, 18, 22-24, and 27 of the '280 patent would not have issued.

176.    Messrs. Gold, Meadows, Chen and possibly others at Boston Scientific knew that these references were material to the subject matter of the pending claims of U.S. Appl. Nos. 09/626,010 and 10/307,098 which issued as the '227 and '280 patent respectively. Yet, Messrs. Gold, Meadows, Chen and possibly others withheld these references from the Patent Office during the prosecution of the two applications, both of which claimed a general rechargeable battery within an IPG.

177.    Messrs. Gold, Meadows, Chen and possibly others had detailed knowledge of the withheld references during the prosecution of the '227 and '280 patents.  For

example, they disclosed these references to the Patent Office during the prosecution of co-pending U.S. Appl. No. 09/627,803, which issued as U.S. Patent No. 6,553,263 ("the '263 patent"), which disclosed a specific type of rechargeable battery within an IPG, and even described certain of the withheld references in detail by, for example, stating in the specification that Munshi and Wang demonstrated the knowledge in the prior art of "a Lithium-ion battery in an implantable medical device" and traversing a Patent Office office action rejection based upon Munshi.

### Prosecution of the '227 Patent Application

178. The '280 patent issued from a continuation application, the parent of which issued as the '227 patent.  The'227 patent shares the same title as the '280 patent—"Rechargeable Spinal Cord Stimulator System"—and, like the '280 patent, emphasizes as an allegedly novel feature the use of an IPG with a "replenishable power source, e.g., a rechargeable battery."  Claims 1-25 and 27-30 recite an implanted IPG with a rechargeable or replenishable battery.

179. The'280 patent also shares the same specification as the '227 patent.  The common specification contains a section called "Background of the Invention" that describes alleged deficiencies in prior art SCS systems.  In discussing the prior art, the specification does not identify or describe any prior art IPGs that used rechargeable batteries.  Instead, the specification states that power storage capabilities were a key problem with prior art SCS systems.  The specification further states that the "present invention" solved that problem by introducing an IPG with "a rechargeable power source, e.g., a rechargeable battery that allows the patient to go about his or her daily business unfettered by an external power source and controller."

24

180.    In-house prosecuting attorney Mr. Gold represented Boston Scientific during the prosecution of both the '280 and the '227 patent applications.  Mr. Gold filed the '227 patent application on July 26, 2000.  The Patent Office rejected the application twice before allowing it.  In the second rejection, on April 4, 2002, the Patent Office rejected claims 2, 3, 19 and 20 of the application (corresponding to issued claims 1, 2, 17, and 18) as anticipated by U.S. Patent No. 6,233,488 ("Hess").  The examiner determined that Hess "describes an implantable spinal cord stimulator . . . and corresponding external structures . . . which appear to read upon applicant's claimed features."  The examiner found that "[i]t would be obvious, if not inherent, for the IPG to utilize a rechargeable internal battery given its energy recharging circuits and the fact that it may utilize an internal battery."

181.    Mr. Gold responded to the rejection. In a response filed May 20, 2002, he represented to the Patent Office that "[t]he present application is titled 'Rechargeable Spinal Cord Stimulator System' because one of the features of the [claimed] system is the novel ability to recharge the battery contained in the IPG."  Gold then highlighted language from the patent's specification that similarly highlighted use of a "rechargeable internal battery" or "rechargeable power source" as an allegedly novel feature of the claimed invention.

182.    Two months later, on July 29, 2002, the Patent Office accepted Mr. Gold's arguments that use of rechargeable batteries was a novel feature and allowed the claims.  The Patent Office stated that it allowed the patent specifically due to the novelty of using an IPG with a rechargeable battery:

> *The applicant's claimed SCS comprises an implantable pulse generator (IPG) having the unique feature of a rechargeable or replenishable power source*.  Heretofore, power sources for such systems were restricted to either implanted batteries or to completely externally based RF induced energy sources as described by Hess…*To have utilized an implantable power*

> *source, which is rechargeable from an external*
> *programmer/power source, appears to be new in the art*.

(emphasis added).

183.   Neither Mr. Gold nor anyone else associated with Boston Scientific

disagreed with or corrected this statement, despite having knowledge of the withheld references

which "utilized an implantable power source, which is rechargeable from an external

programmer/power source."

### Boston Scientific's Failure to Disclose Prior Art That Was Cited, Discussed and Traversed in the Contemporaneous '263 Patent Application

184.   Mr. Gold was fully aware of the withheld references when he filed his

May 20, 2002 response.  Just two days after filing the '227 patent application, Mr. Gold filed a

separate patent application on behalf of Boston Scientific that would later issue as the '263

patent.  The '263 patent is entitled "Implantable Pulse Generators Using Rechargeable Zero-Volt

Technology Lithium-Ion Batteries" and shares three inventors with the '227 and '280 patents.  It

claims implantable medical systems that use a "rechargeable battery compris[ing] a lithium-ion

battery *configured to permit discharge to zero volts without damage to the battery*" (emphasis

added).

185.   The '263 patent application adopted large portions of the "Background of

the Invention" from the common specification of the '227 and '280 patent applications.

███████████████████████████████████████████████████████

████████████████████████.  However, the '263 patent application added to the

"Background of the Invention" section language omitted from the '227/'280 common

specification regarding the state of the art for rechargeable batteries in implanted devices and the

identity of specific prior art references, including the Munshi and Wang references.

186.    These omissions were material.  For example, in language omitted from the '227/'280 common specification, the '263 patent specification states that rechargeable batteries within implanted devices were commonly known in the art:

> ***It is known in the art to use a rechargeable battery within an implant device***.  See, e.g., U.S. Pat. No. 4,082,097, entitled "Multimode Recharging System for Living Tissue Stimulators", and applicant Mann's U.S. patent application Ser. No. 09/048,826, filed Mar. 25, 1998, entitled "System of Implantable Devices for Monitoring and/or Affecting Body Parameters", which patent and patent application are likewise incorporated herein by reference.

(emphasis added).

187.    Citing the Munshi and Wang references, the '263 patent application further discloses that rechargeable-lithium based batteries were known in the prior art and used in implantable medical devices:

> Rechargeable lithium-based batteries were first developed in the 1970s using lithium metal as the active electrode material. Lithium has great promise as a battery material because it is the lightest of all metals, with high cell voltage (>3 V) and high energy density . . . ***It is known in the art to use a Lithium-ion battery in an implantable medical device, see, e.g., U.S. Pat. Nos. 5,411,537 and 5,560,693***.

(emphasis added).

188.    Although the "Background of the Invention" section in the '263 patent references at least two prior art references—Munshi and Wang—disclosing rechargeable batteries in IPGs, the specifications of the '227 and '280 patents do not include the same disclosure.  Munshi, Wang, Barreras and Schulman were also withheld from the Patent Office during prosecution of the '227 and '280 patent applications.  Because the '263 patent application was prosecuted before a different examiner (George R. Evanisko) than the '227 and '280 patent applications (which were examined by Carl Layno), the examiner of the '227 and '280 patent applications was not provided with material information concerning the state of the art for

rechargeable batteries in implanted devices and the specific withheld references described in the '263 patent application during his review of the '227 and '280 patent applications.

189.    In addition to the references to Munshi and Wang in the specification, Mr. Gold disclosed other prior art references disclosing similar subject matter—an implantable stimulation pulse generating medical device with a rechargeable battery—during the prosecution of the '263 patent application including U.S. Patent No. 5,733,313 ("Barreras") and U.S. Patent No. 6,067,474 ("Schulman").

190.    During the prosecution of the '263 patent application, that examiner (George R. Evanisko) rejected several claims as obvious over Munshi.  Examiner Evanisko determined that Munshi discloses an implantable medical system containing a rechargeable lithium-ion battery.  Mr. Gold responded by admitting that Munshi disclosed implantable medical devices with IPGs that used "conventional rechargeable lithium batteries" but distinguished it on other bases in a 10-page analysis and response to the Office Action.  Mr. Gold made this representation on October 4, 2002—just two months after the '227 patent examiner had accepted his argument that the use of IPGs with rechargeable batteries was "novel" and before either the asserted '280 patent or its parent '227 patent issued.

191.    Despite specifically analyzing and discussing prior art disclosing implantable IPGs with rechargeable batteries when prosecuting the contemporaneously pending '263 patent application, Mr. Gold withheld this prior art from the examiner of the '227 and '280 patent applications and affirmatively mislead him to believe that no such prior art existed.  As a result, the Examiner allowed the '227 patent to issue based on his incorrect understanding that use of an IPG with a rechargeable battery was "unique".  The Examiner's incorrect understanding is a direct result of the misleading actions of Mr. Gold and others.

192.    But for the failure to disclose one or more of the Munshi, Wang, Barreras and Schulman references, the '227 and '280 patents would not have issued.

193.    The single most reasonable inference to be drawn from the foregoing facts is that Mr. Gold and others knowingly and deliberately withheld highly material prior art from the Patent Office during prosecution the '227 and '280 patent applications with specific deceptive intent to deceive the Patent Office.

194.    Mr. Gold's failure to disclose the withheld references during the prosecution of the '227 and '280 patent applications violated his duty of candor and good faith in dealing with the Patent Office.

195.    Named inventors also failed in their duty to disclose the withheld references.

196.    During the prosecution of the '227 and '280 patent applications, the inventors each submitted a declaration stating that he or she had reviewed and understood the contents of the '227 and '280 patent specifications and claims.  Through this declaration, each inventor acknowledged his or her "duty to disclose all information which is material to [the] patentability" of the claimed invention.  Three of these inventors—Joey Chen, Paul Meadows, and Carla M. Mann—also were named inventors of the '263 patent and submitted similar declarations during the prosecution of the '263 patent.

197.    Inventor Joey Chen was ███████████████████████████ ██████████████████████████████████████████ He reviewed the '227 and '280 patent specifications before they were submitted to the Patent Office and agreed with the disclosures made therein.  According to the declaration he submitted in relation to the '263 patent application, he also reviewed the '263 patent specification and agreed

with those disclosures, which included multiple paragraphs discussing the known state of the art regarding IPGs with various types of rechargeable batteries, and disclosure of the withheld references.

198.    It would have been known to Mr. Chen that the '227 and '280 patent specifications claim that the "ability to recharge the battery contained in the IPG" is novel, and that this claim directly contradicts the '263 patent specification's disclosure that it was "known in the art to use a rechargeable battery within an implant device."  Mr. Chen had a duty to identify the withheld references and to correct the deficiencies regarding statements concerning the prior art in the '227 or '280 patent specifications, and failed to fulfill that duty.

199.    Further, Mr. Chen was directly aware of work that led to at least the Munshi reference and possibly the Wang reference.  Mr. Chen worked with the primary inventor of the Munshi reference, and ████████████████████████████████ ████████████████████████████████ Xintao Wang, the inventor of the Wang reference cited in the '263 patent specification, who also worked at Intermedics.  Despite this knowledge, neither the Munshi reference nor the Wang reference were disclosed during the prosecution of the '227 or '280 patents though both were included in the "Background of the Invention" section of the '263 patent known to Mr. Chen when that language was adopted from the '227 patent specification.

200.    Based on at least the foregoing, Mr. Chen knew that prior art disclosing IPGs with rechargeable batteries had not been disclosed to the Patent Office during prosecution of the '227 and '280 patents.

201.    The first named inventor of the '227, '280 and '263 patents, Paul Meadows, has stated that, ████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████ Because

the '263 patent specification specifically identifies Munshi and Wang, ████████████████████████

████████████████████████████████████████████

██████ he signed his inventor declaration for the '263 patent application on November 26, 2002.

However, Mr. Meadows failed in his duty to disclose those references to the Patent Office during

the prosecution of the '227 and '280 patent applications. ████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████, Mr. Meadows failed in his duty to disclose Munshi to the

examiner of the '227 and '280 patent applications.

202.    Based on at least the foregoing, Mr. Meadows knew that prior art

disclosing IPGs with rechargeable batteries had not been disclosed to the Patent Office.

203.    In the '227 and '280 patent applications, in which Boston Scientific

claimed that the concept of rechargeable batteries in an IPG was novel, Messrs. Gold, Meadows,

Chen, and possibly others withheld prior art disclosing the same.  However, in the

contemporaneous '263 patent application, where Boston Scientific claimed a ***specific type*** of

rechargeable battery in an IPG—specifically "a lithium-ion battery configured to permit

discharge to zero volts without damage to the battery"—Mr. Gold and Boston Scientific not only

disclosed this otherwise withheld prior art, they also traversed that same art while admitting that it disclosed the very feature it claimed was novel in the '227 and '280 patent applications.  This withheld art was material to the prosecution of the '227 and '280 patents and, but for the failure to disclose these references, the '227 and '280 patents would not have issued.

204.    The foregoing facts demonstrate that Messrs. Gold, Meadows, Chen and possibly others knowingly and deliberately withheld the Munshi, Wang, Barreras and Schulman references as well as other material and non-cumulative prior art during the prosecution of the '227 and '280 patent applications with a specific intent to deceive the Patent Office.  This is the single most reasonable inference from these facts.

205.    These facts also demonstrate that Messrs. Gold, Meadows, Chen and possibly others engaged in affirmative egregious misconduct towards the Patent Office.

206.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. et seq., Nevro requests a declaration that the '280 and '227 patents are unenforceable due to inequitable conduct.

## SECOND CLAIM FOR RELIEF
**(Infectious Unenforceability Due to Inequitable Conduct in Connection With the Prosecution of the Patent Applications Leading to the Issuance of the '280 Patent)**

207.    Based on the filing of this action, Boston Scientific's ownership interest in the '280 patent and Nevro's Affirmative Defenses, an actual controversy has arisen and now exists between Plaintiffs and Nevro as to the enforceability of the '280 patent.

208.    The '280 patent is unenforceable because (a) inequitable conduct was committed during the prosecution of the application leading to the issuance of the '227 patent, which application is in the chain of applications leading to the issuance of the '280 patent, and (b) such inequitable conduct relates to one or more of the asserted claims of the '280 patent. Accordingly, the '280 patent is unenforceable under the doctrine of infectious unenforceability.

209.    The '280 patent states on its face that it is related to the '227 patent, that its application was filed as a continuation of the application for the '227 patent and that it claims priority from the application for the '227 patent.  Thus, the application for the '227 patent is related to, and is in the chain of applications leading to the issuance of, the '280 patent.  Further, inequitable conduct in the course of prosecuting the parent application also infects related continuation applications.

210.    Nevro incorporates paragraphs 24-56 of its First Claim for Relief as if fully set forth herein.

211.    The inequitable conduct committed during the prosecution of the application for the '227 patent is closely related to one or more of the asserted claims of the '280 patent.

212.    More particularly, Boston Scientific has asserted that Nevro infringes claims 8, 18, 22-24, and 27 of the '280 patent.  At least asserted claims 8, 18 and 22 of the '280 patent are similar to at least claim 1 of the '227 patent in that the claims recite at least the following substantially similar language:

| **'227 Patent Claim 1** | **'280 Patent Claim 8** |
|---|---|
| "A spinal cord stimulation (SCS) system comprising . . . a multichannel implantable pulse generator (IPG) having a rechargeable power source . . ." | "A spinal cord stimulation system comprising: a multi-channel implantable pulse generator (IPG) having a replenishable power source . . ." |

**'280 Patent Claim 18**

"A spinal cord stimulation system comprising: a multi-channel implantable pulse generator (IPG) having a replenishable power source . . ."

**'280 Patent Claim 22**

"spinal cord stimulation system

33

comprising: an implantable, multi-channel implantable pulse generator (IPG) having a replenishable power source . . ."

213. The Munshi, Wang, Barreras and Schulman references would have been material to the examination of at least claims 8, 18 and 24 of the '280 patent, at least by virtue of the functionality of these spinal cord systems containing a rechargeable battery within an implantable pulse generator. The intentional failure to disclose the Munshi, Wang, Barreras and Schulman references to the Patent Office during the prosecution of both the '227 patent and the '280 patent thus constitutes inequitable conduct for at least these claims.

214. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. *et seq.*, Nevro requests a declaration that the '280 and '227 patents are unenforceable due to inequitable conduct.

### THIRD CLAIM FOR RELIEF
**(Unenforceability Due to Inequitable Conduct in Connection With *Inter Partes* Review Proceedings Before the Patent Trial and Appeal Board)**

215. Based on the filing of this action, Boston Scientific's ownership interest in the '280 patent and Nevro's Affirmative Defenses, an actual controversy has arisen and now exists between Plaintiffs and Nevro as to the enforceability of the '280 patent.

216. The '280 patent is unenforceable because Boston Scientific and individuals representing Boston Scientific (hereinafter collectively "Boston Scientific") violated their duty of candor and good faith in dealing with the Patent Office by intentionally and deceptively making false statements and failing to disclose material information to the Patent Office in connection with a petition for *inter partes* review of the '280 patent filed by Nevro. But for Boston Scientific's false statements and failure to disclose this material information to the Patent Office, the '280 patent would be found unpatentable. As a result of Boston Scientific's false statements and failure to disclose material information, the PTAB declined to

institute review of at least one of Nevro's petitions for *inter partes* review ("IPR") of the '280 patent.

217.    Boston Scientific, in a response dated November 7, 2017 to the petition for IPR filed by Nevro (Petition Number 2017-01811), falsely told the Patent Trial and Appeal Board ("PTAB") that the novel aspect of the '280 patent was the use of detachable leads and an external trial stimulator with a spinal cord stimulation systems.  Not only were these statements inconsistent with Boston Scientific's prior representations to the Patent Office as to the allegedly novel features of the '280 patent being the use of a rechargeable battery, but they were false because use of detachable leads and external trial stimulators was not novel and Boston Scientific knew that prior to making the statement.

218.    For example, named inventor Mr. Meadows has testified under oath in this action that the use of detachable leads "preexisted before the '280 invention," including in SCS systems, and that external trial stimulators also were known.  Boston Scientific did not present Mr. Meadows' testimony to the PTAB or correct its false statements in light of Mr. Meadows' testimony.

219.    Attempting to cover up its misrepresentation and failure to disclose material information, Boston Scientific has prevented Nevro from presenting that testimony to the PTAB by improperly designating it as "Highly Confidential" under the existing Protective Order in this action.  Testimony about the state of prior art cannot possibly be "Highly Confidential" information, and Boston Scientific has no plausible good faith basis for de-designating it.  The only motive for its tactics is to maintain its deception and mislead the PTAB into believing that use of detachable leads originated with the '280 patent.

220.    On July 21, 2017, Nevro filed an IPR petition challenging the validity of claims 1, 4, 7-9, 11, 18-19 and 21 of the '280 patent.  This petition was docketed in the Patent Office as IPR No. 2017-01811.  Nevro's petition addressed each limitation of the challenged claims, including the allegedly novel use of a rechargeable battery.  Boston Scientific filed a Patent Owner Preliminary Response on November 7, 2017.  On February 5, 2018, the PTAB denied institution of inter partes review.

221.    Boston Scientific's counsel David A. Caine, who is also Boston Scientific's trial counsel in this action, signed the Patent Owner Preliminary Response ("Response") dated November 7, 2017 on behalf of Boston Scientific.  That Response did not address the use of a rechargeable battery as the inventive aspect of the claims as asserted during the prosecution of the '280 patent.  Instead, it focused almost entirely on the novelty of a limitation in the '280 patent's claims regarding detachable leads: "an implantable electrode array detachably connected to the IPG."  The basis of Boston Scientific's argument was that the '280 patent should be maintained as patentable because its use of detachable leads in combination with an external trial stimulator was novel.

222.    Boston Scientific stated in the Introduction of the Patent Owner Preliminary Response:

> The Challenged Claims recite a spinal cord stimulation system (SCS) used to treat chronic pain by providing electrical stimulation pulses from an electrode array, placed epidurally near a patient's spine, which is detachably connected to an implantable pulse generator (IPG), as well as use of an external trial stimulator (ETS) connected to the electrode array for a trial period before implantation of the IPG. The Petition challenges the claims with one primary reference, Holsheimer.  But Holsheimer—alone or in combination with other cited references—fails to teach a SCS with this novel combination of features.

223.    Under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the

[Patent Office], which includes a duty to disclose to the [Patent Office] all information known to that individual to be material to patentability." This duty applies to attorneys representing parties before the Patent Office in *inter partes* review.

224.    Boston Scientific falsely represented that an SCS system combining detachable leads with use of an external trial stimulator was "novel." The Patent Owner Preliminary Response noted for example that a portion of the '280 patent's specification describing a "novel toolless connector that…allows the electrode array 110 or extension 120 to be detachably secured" to an IPG. (Emphasis added).

225.    On February 5, 2018, the PTAB denied institution of Nevro's 2017-01811 IPR Petition. In particular, the PTAB focused its denial on the detachable leads limitation. The PTAB noted that Boston Scientific disputed Nevro's claims because "neither Holsheimer nor Munshi disclose the claimed 'implantable electrode array *detachably connected to the IPG*.'" (Emphasis added). Based on this representation, the PTAB determined that Nevro's "Petition has not demonstrated a reasonable likelihood of prevailing on this ground."

226.    However, unknown to the PTAB is that Boston Scientific's first named inventor, Paul Meadows, testified directly to the contrary on January 12, 2018 that detachable leads with an IPG "preexisted" the '280 alleged invention:

Q.  Okay.  Did Mr. Payne invent the use of detachable leads with an IPG?

The Witness:  No, they preexisted.

Q.  Okay.  Preexisted before the '280 invention?

A.  There are detachable leads in pacemakers.  There are detachable leads in deep brain stimulators and spinal cord stimulators, all of which preexisted prior to our entering the field.

227.    Meadows further testified:

Q.  And we talked about this before.  Implantable electrode arrays that are detachably connected to the IPG was also known.

A.  Yes.

228.    He also testified that external trial stimulators were known in the art:

Q.  Were external trial stimulators known.

A. Yes.

229.    This testimony and any related information would have been highly material to the decision by the PTAB on whether to institute *inter partes* review and in finding the '280 patent to be unpatentable.

230.    By no later than January 12, 2018—the date of Mr. Meadows' testimony—and likely earlier than January 12, 2018, Boston Scientific knew that detachable leads with use of an external trial stimulator or an IPG were not novel or unobvious.  Despite that knowledge, Boston Scientific made statements to the contrary to the PTAB and did not correct the false statements made to the PTAB in the Patent Owner Preliminary Response, prior to the decision by the PTAB not to institute an IPR proceeding.  Despite having undisclosed material information and knowing that a decision on institution was due on or about February 7, 2018, Boston Scientific failed to submit Mr. Meadows' testimony to the PTAB prior to its institution decision, and has perpetuated the deception by not providing this material information and seeking reconsideration of that decision.  Knowing that an institution decision was imminent, Boston Scientific had a duty, at least by January 12, 2018, to disclose at least Mr. Meadows' testimony to the PTAB. Given that Mr. Meadows was represented by Boston Scientific's trial counsel, it is likely that Boston Scientific was in possession of this undisclosed material information earlier, even before it filed its Response.

231.     Further, Boston Scientific has actively prevented Nevro from submitting Mr. Meadows' testimony to the PTAB to alert the PTAB to the falsity of Boston Scientific's submission.  On January 17, 2018, Boston Scientific's counsel emailed Nevro's counsel stating that "BSC marks the entire Meadows deposition transcript as Highly Confidential—Attorneys' Eyes Only pursuant to Section 5.3 of the Stipulated Protective Order in this case."  Nevro's counsel responded by requesting that Boston Scientific withdraw confidentiality designations for substantial portions of the transcript—including Mr. Meadows' admissions regarding the state of the prior art.  Boston Scientific refused.  Boston Scientific maintained, without any good faith basis, that Mr. Meadows' admissions regarding the state of the public prior art were "Highly Confidential."  This is consistent with Boston Scientific's litigation misconduct in the California action between the parties, in which the Northern District of California Court found that Boston Scientific and its counsel (which overlap with Boston Scientific's counsel in this case) engaged in "misuse of the sealing process" to conceal non-confidential, potentially damaging information to BSC.  *See Nevro Corp. v. Boston Scientific Corp.*, Case No. 3:16-cv-6830, D.I. 294 at 2-3 (N.D. Cal. Feb. 15, 2018).

232.     These actions by Boston Scientific and its counsel have prevented Nevro from submitting Mr. Meadows' testimony to the PTAB.

233.     Mr. Meadows' knowledge and testimony are highly material as demonstrated by the PTAB's denial of institution for Nevro's 2017-01811 IPR Petition based on the failure of the prior art to disclose detachable leads.

234.     Based upon these facts, intent to deceive the Patent Office is the single most reasonable inference that can be drawn from Boston Scientific's counsel's actions demonstrated by at least:  (1) Boston Scientific's knowledge that SCS systems with detachable

leads connected to an IPG in combination with an external trial stimulator were known in the

prior art; (2) Boston Scientific's failure to disclose this information to the Patent Office;

(3) Boston Scientific's misrepresentations to the Patent Office that "a spinal cord stimulation

system (SCS)" containing leads "which [are] detachably connected to an implantable pulse

generator (IPG), as well as use of an external trial stimulator (ETS)" was a "novel combination

of features" or failure to disclose such information upon learning it; and (4) the fact that Boston

Scientific has inappropriately used the Protective Order in this case to prevent Nevro from

disclosing its inventors' admission regarding the state of the prior art to the Patent Office.

235.    But for Boston Scientific's counsel's false statement to the Patent Office

and this failure to disclose Inventor Meadows' testimony, the PTAB would have instituted

Nevro's IPR petition and would have ultimately determined that the '280 patent is unpatentable.

236.    Separately, Boston Scientific's conduct in the IPR proceedings, by itself

and in combination with its abuse of the Protective Order in this action, amounts to affirmative

egregious misconduct that warrants a finding of unenforceability.

237.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. *et seq.*,

Nevro requests a declaration that the '280 patent is unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, Nevro respectfully requests the following relief:

A.    The entry of judgment that Nevro has not infringed, induced infringement,

contributed to infringement, and/or engaged in export infringement of any valid claim of the

Asserted Patents;

B.    The entry of judgment finding that each of the Asserted Patents is invalid

and unenforceable under applicable law;

C.      The entry of judgment that Boston Scientific recovers nothing on the First Amended Complaint;

D.      The entry of judgment that this is an exceptional case under 35 U.S.C. § 285, and awarding Nevro its attorneys' fees in this case;

E.      The entry of judgment in favor of Nevro and against Boston Scientific that interest, costs, and expenses be awarded to Nevro;

F.      The entry of judgment that the '280 and '227 patents are unenforceable; and

G.      Any other relief that the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Nevro demands a jury trial on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*
_____

OF COUNSEL:

Bradford J. Badke
Ching-Lee Fukuda
Sona De
Todd M. Simpson
Ketan V. Patel
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY  10019
(212) 839-5300

Sharon Lee
Thomas A. Broughan III
Benjamin H. Huh
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
(202) 736-8000

Rodger D. Smith II (#3778)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
mflynn@mnat.com

*Attorneys for Defendant*

Nathan A. Greenblatt
Sɪᴅʟᴇʏ Aᴜsᴛɪɴ LLP
1001 Page Mill Road Building 1
Palo Alto, CA  94304
(650) 565-7107

February 20, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2018, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

February 20, 2018, upon the following in the manner indicated:

Karen L. Pascale, Esquire                                    *VIA ELECTRONIC MAIL*
Pilar G. Kraman, Esquire
YOUNG CONAWAY STARGATT &TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiffs*

Edward Han, Esquire                                          *VIA ELECTRONIC MAIL*
Matthew M. Wolf, Esquire
Marc A. Cohn, Esquire
William Z. Louden, Esquire
Chris Moulder, Esquire
Amy DeWitt, Esquire
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC  20001-3743
*Attorneys for Plaintiffs*

Krista Carter, Esquire                                       *VIA ELECTRONIC MAIL*
Edmond Ahadome, Esquire
David A. Caine, Esquire
Michael D.K. Nguyen, Esquire
Carson D. Anderson, Esquire
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA  94306-2112
*Attorneys for Plaintiffs*

Soumitra Deka, Esquire                          *VIA ELECTRONIC MAIL*
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA  94111-4024
*Attorneys for Plaintiffs*

Oscar Ramallo, Esquire                          *VIA ELECTRONIC MAIL*
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street
Forty-Fourth Floor
Los Angeles, CA  90017-5844
*Attorneys for Plaintiffs*

*/s/ Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)