# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORP. and BOSTON SCIENTIFIC NEUROMODULATION CORP., <br><br> Plaintiffs and Counter-Defendants, <br><br> v. <br><br> NEVRO CORP., <br><br> Defendant and Counterclaimant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 16-1163-CFC-CJB <br> CONSOLIDATED |

## MEMORANDUM ORDER

Presently pending before the Court are the parties' discovery disputes regarding trade secret discovery. (Civil Action No. 18-644-CFC-CJB, D.I. 151)[1] The Court[2] has considered the parties' letter briefs, (D.I. 155; D.I. 157; D.I. 159; D.I. 161), and the parties' arguments made during the June 22, 2020 teleconference, (D.I. 165 (hereinafter, "Tr.")). It ORDERS that the disputes be resolved in the manner set out below.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Boston Scientific Corp. and Boston Scientific Neuromodulation Corp. ("Plaintiffs" or "BSC" or "Boston Scientific") and Defendant Nevro Corp. ("Defendant" or

---

[1] These disputes originally arose in Civil Action No. 18-644-CFC-CJB ("Nevro II"). On June 22, 2020, the District Court consolidated Civil Action No. 16-1163-CFC-CJB ("Nevro I") and Nevro II. (Civil Action No. 18-644-CFC-CJB, June 22, 2020 Oral Order) All citations below, unless otherwise noted, are to the docket in Nevro II.

[2] Nevro I and Nevro II have been referred to the Court to hear and resolve discovery disputes and protective order disputes. (Civil Action No. 16-1163-CFC-CJB, Aug. 7, 2020 Docket Entry; Civil Action No. 18-644-CFC-CJB, D.I. 51 at 9)

"Nevro") are involved in the spinal cord stimulation ("SCS") industry, developing and selling SCS products for the treatment of chronic pain. (D.I. 48 at ¶¶ 1, 12-13; D.I. 62 at 3 at ¶ 12; *id.* at 29-30 at ¶¶ 10-13) BSC commenced Nevro I on December 9, 2016, alleging that Nevro's Senza® SCS system infringes several BSC patents. (Civil Action No. 16-1163-CFC-CJB, D.I. 1; D.I. 13) On April 27, 2018, BSC commenced Nevro II, alleging that: (1) Nevro's Senza® SCS system, Senza II™ SCS system and Senza® Omnia™ SCS system infringes several BSC patents; and (2) Nevro has misappropriated BSC's trade secrets (the "trade secrets claim") in violation of the California Uniform Trade Secrets Act ("CUTSA"). (D.I. 1; D.I. 48 at ¶¶ 1-3, 182-205)[3]

With respect to its trade secrets claim, which is set out in Count IX of the operative Second Amended Complaint ("SAC"), BSC alleged that its former employee James Thacker "took thousands of confidential Boston Scientific documents with him" when he left employment with BSC and that, while later employed by Nevro, Mr. Thacker disclosed BSC's confidential, proprietary information to Nevro "[o]n multiple occasions[.]" (D.I. 48 at ¶¶ 191-92, 194) The SAC then discusses two specific examples of such improper disclosure, both of which involve Mr. Thacker providing a BSC document to a former BSC employee who now (like Mr. Thacker) worked for Nevro; the two documents at issue were a "Stimulus™ Confirmatory Study" (the "Confirmatory Study") and a "Spinal Cord Stimulator Clinician's Programming System, Module Specification" (the "Module Specification"). (*Id.* at ¶¶ 194-201)

Nevro moved to dismiss BSC's trade secrets claim (the "motion to dismiss"), arguing that BSC failed to allege sufficient facts in support thereof. (D.I. 11 at 16-19) On November 25,

---

[3] In Nevro II, Nevro has filed counterclaims alleging, *inter alia*, that BSC's SCS systems infringe several of Nevro's patents. (D.I. 62 at 27 at ¶ 1; *id.* at 32-33 at ¶ 21)

2019, the District Court denied Nevro's motion to dismiss as to BSC's trade secrets claim ("the November 25, 2019 Memorandum Order"),[4] concluding that BSC's allegations were sufficiently plausible to state a claim. (D.I. 23 at 21-25)[5]

On May 7, 2020, the Court resolved a prior discovery dispute between the parties. In doing so, it granted-in-part BSC's request that the Court compel Nevro to substantively respond to BSC's outstanding trade secret discovery requests (i.e., BSC's Interrogatories 1-6 and 8 and Requests for Production 1-57) (collectively, the "trade secret discovery"). (D.I. 128) Nevro had argued that it should not be required to respond to the trade secret discovery for two reasons: (a) it had filed a motion to stay BSC's trade secrets claim because the claim was subject to arbitration (the "motion to stay"); and (b) it need not respond to the discovery requests at issue "'because BSC has yet to identify its trade secrets with sufficient specificity'" as required by California Code of Civil Procedure 2019.210 ("Section 2019.210"). (*Id.* (citation omitted)) With respect to Nevro's first argument, the Court found it wanting, noting that the motion to stay was then still pending and that the pendency of the motion provided no reason to absolve Nevro of its discovery responsibilities. (*Id.*)[6] And as for Nevro's second argument, the Court explained that: (a) certain of the trade secret discovery did not appear to require an identification of

---

[4] Although Nevro's motion to dismiss and the District Court's November 25, 2019 Memorandum Order addressed BSC's First Amended Complaint, and the currently-operative complaint is BSC's SAC, (D.I. 10; D.I. 23; D.I. 48), the substance of BSC's trade secrets claim has not changed, (*see* D.I. 5; D.I. 34, ex. B; D.I. 35 at 2; D.I. 48; D.I. 157 at 2).

[5] In the portion of the District Court's November 25, 2019 Memorandum Order where the District Court considered whether BSC had pleaded sufficient facts to allege the existence of a trade secret, when the District Court referenced the "alleged trade secrets[,]" it was referring solely to the Confirmatory Study and the Module Specification. (D.I. 23 at 23-25)

[6] Indeed, the District Court has since denied Nevro's motion to stay. (June 22, 2020 Oral Order)

3

particular trade secrets in order for a response to be provided (such as Interrogatory Nos. 1, 4 and 8); and (b) even assuming *arguendo* that Section 2019.210 applies to BSC's trade secrets claim, Nevro had to date only specifically identified deficiencies with respect to 4 of the 64 purported trade secrets that were set out in BSC's Initial Disclosure of Trade Secrets ("BSC's Disclosure").[7] (*Id.*) The Court therefore ordered Nevro to: (a) provide substantive responses to the trade secret discovery that did not require identification of the "Trade Secrets at Issue" within 14 days; (b) provide substantive responses within 30 days regarding the remainder of the trade secret discovery as to those purported trade secrets in BSC's Disclosure that Nevro had not yet specifically addressed as deficient; and (c) further meet and confer with BSC with respect to the four purported trade secrets that Nevro had addressed in detail (and to utilize the Court's discovery dispute procedures to the extent that the parties could not reach agreement). (*Id.*)

On May 21, 2020, Nevro provided its supplemental responses to Interrogatory Nos. 1, 4 and 8 as well as supplemental responses to BSC's trade secret document requests. (D.I. 155, ex. B; D.I. 156, ex. A) Thereafter, the current discovery dispute was brought to the Court's attention.

## II.    STANDARD OF REVIEW

Generally, a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs to the case[.]" Fed. R. Civ. P. 26(b)(1). Courts generally construe Rule 26 to allow for "broad" and "liberal" discovery. *Pacitti v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999); *Robert D. Mabe, Inc. v. Optum Rx*, CIVIL ACTION NO. 3:17-1102, 2020 WL 4334976, at *1 (M.D. Pa. July 28, 2020); *AgroFresh*

---

[7] Nevro had by then provided argument about specific alleged deficiencies only with regard to BSC's Trade Secret Nos. 2, 10, 47 and 56. (D.I. 115, ex. G)

*Inc. v. Essentiv LLC*, Civil Action No. 16-662-MN-SRF, 2018 WL 9578196, at *2 (D. Del. Dec. 11, 2018). When a party objects to discovery requests, "the burden falls on the party seeking the discovery to show the relevance of the information requested." *Tessera, Inc. v. Broadcom Corp.*, Civil Action No. 16-380-LPS-CJB, 2017 WL 4876215, at *2 (D. Del. Oct. 24, 2017) (internal quotation marks and citation omitted). Discovery is relevant if used to "flesh out a pattern of facts already known to a party relating to an issue necessarily in the case." *Id.* (internal quotation marks and citation omitted). Requested information is not relevant, however, if the inquiry is based on mere suspicion or speculation. *Id.* "Once relevance is shown, the party opposing discovery may show why discovery, even if relevant, should not be permitted." *Paoli v. Stetser*, Civil Action No. 12-66-GMS-CJB, 2013 WL 2154393, at *3 (D. Del. May 16, 2013) (quoting *Kaiser v. Stewart*, Civ. A. No. 96-6643, 1996 WL 730533, at *2 (E.D. Pa. Dec. 10, 1996)).

Discovery is, of course, not without its limits. To that end, Rule 26 also provides that "[a] party . . . from whom discovery is sought may move for a protective order[,]" and that in order to protect the party from "annoyance, embarrassment, oppression, or undue burden or expense" the Court may issue such an order and limit the scope of discovery. Fed. R. Civ. P. 26(c)(1). The party seeking a protective order must show that good cause exists for protection of that material, and good cause is established by demonstrating that disclosure of the information will cause a clearly defined and serious injury. *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995). "Broad allegations of harm, unsubstantiated by specific examples . . . will not suffice." *Id.*

**III.   DISCUSSION**

The parties' instant disputes involve the same trade secret discovery. Both parties have moved for relief (with BSC asking that the Court order Nevro to provide certain trade secret discovery and Nevro seeking a protective order to the effect that it need not do so).

The parties' disputes break down into a few categories. First, BSC argues that Nevro's "supplemental responses to BSC's Interrogatory Nos. 1, 4, and 8" are deficient. (D.I. 155 at 2) Second, BSC asserts that Nevro has failed to timely respond to certain of its requests for production of documents that "do not depend on the specificity with which BSC's trade secrets are disclosed[.]" (*Id.*) Third, and more generally, BSC and Nevro disagree about whether Nevro can or should have to substantively respond to other of the trade secret discovery at issue, in light of Nevro's assertion that BSC has not sufficiently identified the underlying trade secrets that are relevant to those requests. (*Id*. at 3-4; D.I. 157 at 2-3; D.I. 159 at 1-2, 4) On this score, Nevro is requesting a protective order limiting BSC's trade secret discovery requests only to information relevant to the trade secrets claim set out in the SAC; to the extent that BSC is allowed discovery outside the scope of its SAC, Nevro requests that BSC first be compelled to identify its trade secrets with particularity as required by Section 2019.210 and as requested by Nevro's Interrogatory No. 12. (D.I. 157 at 1-4) Fourth, BSC asks the Court to sanction Nevro under Federal Rule of Civil Procedure 37(b)(2) and award BSC its reasonable expenses attributable to Nevro's refusal to comply with its discovery obligations. (D.I. 155 at 1, 4) The Court will address these issues in turn.

### A.   BSC's Interrogatory Nos. 1, 4 and 8

The Court first addresses BSC's arguments that Nevro's supplemental responses to BSC's Interrogatory Nos. 1, 4 and 8 are deficient.

#### 1.   Interrogatory No. 1

Interrogatory No. 1 requests that Nevro identify all "Former BSC Employee[s]" who had joined Nevro. (D.I. 156, ex. A at 7) Nevro's supplemental response to Interrogatory No. 1 limited its identification of Former BSC Employees to those who joined Nevro before May 2010. (*Id.* at 9) In support of this limiter, Nevro notes that in Count IX, the SAC twice clearly identifies the time period during which Nevro was first "'developing its own SCS system'" as the "'relevant time period'" relating to BSC's trade secrets claim. (*Id.* (quoting D.I. 48 at ¶¶ 197, 202); D.I. 159 at 3) And Nevro explains that it received a CE mark for its first Senza SCS system in May 2010, such that by that point, it would no longer have been "developing its own SCS system[.]" (D.I. 156, ex. A at 9; D.I. 159 at 3; Tr. at 23, 25-26, 32)

Based on the record before it, the Court agrees with Nevro here. While BSC contends that Nevro's supplemental response is insufficient because "Nevro refused to identify BSC employees who joined Nevro after May of 2010," BSC offered no explanation as to *why* (in light of the SAC's allegations regarding what is the "relevant time period" regarding the trade secrets claim) Nevro's hiring of former BSC employees after May 2010 would be relevant to Count IX. (D.I. 155 at 2; Tr. at 8-12)[8] The claim as written focuses on alleged trade secrets that Mr.

---

[8] When the Court posed this question to BSC's counsel during the teleconference, instead of providing a substantive response as to why the time period following May 2010 was relevant, BSC's counsel suggested that it is too late for Nevro to assert its current relevancy-related objections to the trade secret discovery. (Tr. at 8-12; *see also* D.I. 155 at 3) The Court does not share this view, however. The Court's previous resolution of the parties' discovery dispute regarding the trade secret discovery centered on Nevro's position that it need not answer the discovery in light of its then-pending motion to stay, and because BSC failed to sufficiently identify the trade secrets at issue pursuant to Section 2019.210. (*See* D.I. 121) While Nevro had by then also asserted other specific objections to the trade secret discovery, (D.I. 156, ex. A at 7-8), those objections were not reviewed or adjudicated in the prior dispute. Thus, under the circumstances, the Court does not find that Nevro has waived those objections. (D.I. 121 at 3; D.I. 159 at 3-4)

That said, there has to be an end point to Nevro's ability to keep bringing up new or different reasons why it should not be required to respond further to the trade secret discovery at

Thacker disclosed to Nevro employees after Mr. Thacker joined Nevro in 2009, which Nevro allegedly put to use in designing, developing and testing its own Senza SCS system, and in conducting its own clinical investigations relating to that system. (D.I. 48 at ¶¶ 29, 182-205) Thus, the relevant time period relating to the trade secret misappropriation described in this claim is from the date in 2009 when Mr. Thacker joined Nevro (whenever that is) to the time period when Nevro developed its own SCS system (which the Court understands, based on the record before it, to be May 2010). Thus, Nevro's supplemental response to Interrogatory No. 1 is sufficient and BSC's request for further supplementation is DENIED.

### 2. Interrogatory No. 4

Interrogatory No. 4 requests that Nevro "[d]escribe in detail the actions taken by and on behalf of Nevro to identify all BSC documents[,]" including "actions taken by Nevro to locate documents . . . in the possession, custody and control of any Former BSC Employee[.]" (D.I. 156, ex. A at 10) BSC argues that Nevro's supplemental response is insufficient because "Nevro stated that it would only search for documents with file names that BSC had identified years ago in [a previously-filed federal case in] California [between the parties.]" (D.I. 155 at 2) But the interrogatory simply asks for a *description* of Nevro's document location efforts; it does not ask or require that Nevro *perform new* document searches. Moreover, Nevro's supplemental

---

issue. Nevro has now had two opportunities to raise with the Court the merit of any such objections regarding BSC's Interrogatories 1-6 and 8 and Requests for Production 1-57. Thus, going forward, Nevro may continue to litigate objections that it has previously identified to the Court as a basis for resisting production or seeking a protective order regarding the trade secret discovery (e.g., to the extent there are lingering disputes about those already-raised objections that have not yet been finally resolved). But in the future, absent further order of the Court, Nevro may not argue that it can resist such discovery on the basis of an objection that it previously made to BSC, but that it has not raised with the Court during the past two discovery dispute proceedings. (Tr. at 26-27)

response provides a four-and-a-half page "narrative of the actions Nevro took to search for and sequester BSC documents on its systems and, pursuant to Rule 33(d), identifie[s] specific documents that contain responsive information." (D.I. 159 at 2; *see also* D.I. 156, ex. A at 12-16) So the Court does not see how this response is insufficient. It thus DENIES any request by BSC for further supplementation.

### 3. Interrogatory No. 8

Interrogatory No. 8 requests that Nevro "[d]escribe in detail the stage of R&D, design, documentation, clinical work, marketing and/or sales of the Senza Systems at the time Nevro or anyone on behalf of Nevro was in first contact with any Former BSC Employee, including but not limited to James Thacker, David Marco, Wesley Park or Kerry Bradley." (D.I. 156, ex. A at 16) In its briefing, BSC argued that Nevro's supplemental response is insufficient because it provided a "narrative of [Nevro's] corporate history and the development of the Senza® system without any description of the specific design and development work undertaken by [James Thacker, David Marco, Wesley Park, and Kerry Bradley]." (D.I. 155 at 2) But again, that is not what the interrogatory asks for. That is, Interrogatory No. 8 does not ask for Nevro to describe the "specific design and development work undertaken by James Thacker, David Marco, Wesley Park, and Kerry Bradley." (*See* D.I. 159 at 2) Thus, Nevro's supplemental response cannot be insufficient for that reason.

When pressed by the Court on this issue during the teleconference, BSC identified a new reason as to why Nevro's supplemental response was insufficient: that Nevro's response "leave[s] a very large chunk from 2006 to 2009 with respect to developmental work. And that is a very integral key time frame." (Tr. at 6-8; *see also id*. at 24) It is true that Nevro's supplemental response does jump from 2006 to 2009 (and then continues on with a description

9

of its work through May 2015). But as Nevro points out, BSC's trade secrets claim is premised on allegations that Mr. Thacker, who left BSC in August 2006 and joined Nevro in 2009, "took thousands of confidential Boston Scientific documents with him" and "while employed by Nevro . . . disclosed Boston Scientific's confidential, proprietary information to Nevro." (D.I. 48 at ¶¶ 29, 186, 190-91, 194; Tr. at 32) On this record, then, it is not clear to the Court why the 2006 to 2009 period is an "integral" or even relevant time frame regarding BSC's trade secrets claim.

Admittedly, Nevro's supplemental response to Interrogatory No. 8 is pretty broad and general in substance. (D.I. 156, ex. A at 17-20) But so too is the text of the interrogatory itself. The interrogatory asks for Nevro to describe in detail the stage of "R&D, design, documentation, clinical work, marketing *and/or* sales" of the relevant systems at the time Nevro was in first contact *with any* Former BSC Employee[.]" (*Id.* at 16 (emphasis added)) When you ask a very broad, general question you cannot be surprised if you get a very broad, general answer to that question.

For all of these reasons, the Court is not persuaded that Nevro's supplemental response to Interrogatory No. 8 is insufficient. It thus DENIES any request by BSC for further supplementation.

### B. BSC's Requests for Production

The Court next addresses the parties' arguments regarding specific BSC requests for production of documents, to the extent that those requests were referenced by number in the parties' letter briefs. (D.I. 155 at 2; D.I. 159 at 3)

#### 1. Request Nos. 1-2

BSC's Request No. 1 asks for "[d]ocuments sufficient to identify every past or present employee of Nevro who is a Former BSC Employee" and Request No. 2 asks for documents

relating to "any effort by Nevro to recruit employees of BSC or any Former BSC Employee to work on SCS." (D.I. 155, ex. B at 7, 9) To this end, in the body of the SAC it is alleged that Nevro "recruited and hired" "dozens" of former BSC employees and that "one or more" of these people disclosed trade secrets relating to BSC's SCS systems to Nevro, who was developing "an SCS product that competed directly with Boston Scientific's SCS products[.]" (D.I. 48 at ¶ 1) And the SAC (after listing a number of former BSC employees who allegedly went on to work for Nevro) also asserts that "[m]any of these Nevro employees are intimately familiar with Boston Scientific's SCS systems and core SCS technologies, which Boston Scientific has been developing for decades" and that "Nevro strived to acquire information regarding Boston Scientific's SCS systems and core SCS technologies, and its institutional knowledge of the SCS market and SCS business practices from these former Boston Scientific employees." (*Id.* at ¶ 32) But as noted above, when it comes to the actual trade secrets claim in Count IX, the allegations therein are more narrowly focused. That claim, as pleaded, relates to activity taking place within a particular, cabined time period, which resulted in the alleged misappropriation of trade secrets by Nevro. In light of all of this, Request Nos. 1 and 2 are relevant to BSC's trade secrets claim, but only to the extent that they are narrowed to cover the "relevant time period" regarding that claim: from the date of Mr. Thacker's arrival in 2009 through May 2010 (for the reasons described above). (*See* Tr. at 24, 32, 35-36) Thus, BSC's request here is GRANTED-IN-PART, and Nevro should timely produce, no later than 30 days from the date of this Order, any relevant documents within its possession that fall within these parameters.

### 2. Request No. 8

BSC's Request No. 8 ask for documents "relating to [] any lists of BSC customers or past customers." (D.I. 155, ex. B at 22) Nevro asserts that this request is not relevant to BSC's trade

11

secrets claim because none of BSC's identified trade secrets are directed to the identity of BSC's customers.  (D.I. 159 at 3)[9]  But while that may be so, the question for the Court is simply whether the identified discovery is "relevant to any party's claim or defense and proportional to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1).  And in light of BSC's allegations in Count IX, if Nevro possessed lists of BSC's customers or past customers in or near the 2009-May 2010 time frame, then the Court can see how that information would be relevant to BSC's trade secrets claim.  That is, the Court can understand how the existence of such a list would support BSC's allegations that in the relevant time frame, Mr. Thacker was providing Nevro with proprietary BSC trade secrets so that Nevro could develop its own SCS system, all in an effort to unfairly compete with BSC in the SCS space.  (*See* Tr. at 14-16)  Thus, BSC's request here is GRANTED-IN-PART, and Nevro should timely produce, no later than 30 days from the date of this Order, any such BSC customer lists from this relevant time frame.

### 3. Request No. 5

BSC's Request No. 5 asks for documents regarding "the involvement of any Former BSC Employee in the development of any Senza Systems' ability to provide stimulation at frequencies above 1.2kHz."  (D.I. 155, ex. B at 16)  Nevro contends that this request is not relevant because none of BSC's alleged trade secrets are directed to that feature.  (D.I. 159 at 3)

The Court ORDERS that the parties shall further meet and confer with respect to this request.  If there is a credible basis to conclude that in the relevant time frame, BSC's "research and development, product development plans, manufacturing plans and methods, clinical

---

[9]     Nevro also suggests that this request is not limited "to a BSC customer list" but instead is "asking for all customer lists at Nevro."  (Tr. at 25)  But on its face, Request No. 8 simply does not seek that information; it seeks only "lists of BSC customers or past customers."  (D.I. 155, ex. B at 22)  So this concern of Nevro's is not well founded.

investigations, patient data, programming specifications, marketing and sales force plans, product component lists, product specifications and diagrams, and[/or] budgetary, financial and cost data" related to the ability of BSC's products to provide stimulation above such a frequency, (D.I. 48 at ¶ 192), and if there is a credible basis to conclude that BSC did in fact keep such information proprietary to it at that time, then the Court could see how such information could fall within the ambit of the "proprietary data" that Count IX is referring to. However, the Court cannot draw such a conclusion from the SAC, because nothing specific about the "ability to provide stimulation at frequencies above 1.2kHz" is referenced in Count IX or otherwise in the SAC. That said, if BSC can make the above-referenced showing, and if Nevro does have documents relating to the relevant time frame regarding this feature, then such documents would be relevant to the allegations in Count IX, as they could amount to material allegedly provided to Nevro by Mr. Thacker on another of the "multiple occasions" referenced in that claim. The parties shall utilize the Court's discovery dispute procedures in the future if they cannot resolve their dispute about Request No. 5 after further meeting and conferring.

      **C.    Identification of the Relevant Trade Secrets**

Next, the Court addresses the parties' overarching dispute about whether BSC has sufficiently identified the trade secrets at issue, and the extent to which (in light of what BSC *has* alleged/identified) Nevro must respond to the remaining trade secret discovery. On this score, Nevro contends that discovery should be very narrowly tailored to that which "would give [BSC] information about the extent of any misappropriation of the two documents that" BSC specifically discussed in the SAC. (Tr. at 38) For its part, BSC seeks broader discovery to enable it to probe "the scope of the misconduct[—][h]aving established some, was there more?" (*Id.* at 34; *see also id.* at 10-11) This kind of "tension" is not uncommon in trade secret

13

litigation. *See, e.g.*, *T-Mobile USA, Inc. v. Huawei Device USA, Inc.*, 115 F. Supp. 3d 1184, 1193 (W.D. Wash. 2015); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 147 F. Supp. 3d 1147, 1151 (D. Or. 2015).

In this opinion, the Court is not going to be able to (and indeed, has not been provided with the tools to) decide every possible dispute between the parties about every purported trade secret that BSC believes is at issue in the case. Instead, it sets out the following guiding principles that the parties should use to try to resolve their disputes going forward:

- In its prior May 7, 2020 Order, as noted above, the Court required Nevro to provide discovery as to 60 of the 64 purported trade secrets that BSC had identified in its Disclosure (i.e., with regard to all of BSC's 64 purported trade secrets, except for the four purported trade secrets as to which Nevro had by then provided an explanation as to why BSC's Disclosure was insufficient). But the Court now understands that the reason why Nevro had not yet articulated its position as to the other 60 purported trade secrets at issue was because the parties were still in the midst of meeting and conferring, and had not yet had a productive discussion about the Disclosure other than as to Trade Secret Nos. 2, 10, 47 and 56. (D.I. 157 at 4 & ex. B; Tr. at 29-30) In light of this, the Court's May 7 Order should not be interpreted as the final word on whether discovery regarding those 60 other purported trade secrets is warranted.

- The Court is not convinced that Section 2019.210 applies to discovery in this case, for the reasons set out in cases like *SMC Networks, Inc. v. Hitron Techs., Inc.*, SACV 12-1293-JST (RNBx), 2013 WL 12136372, at *3 (C.D. Cal. Mar. 15, 2013) and *Funcat Leisure Craft, Inc. v. Johnson Outdoors, Inc.*, CIV. NO. S-06-0533 GEB GGH, 2007 WL 273949, at *2-3 (E.D. Cal. Jan. 29, 2007). Additionally, in addressing disputes over such discovery, the Court does not see a need to use the phrase "reasonable particularity." *Cf. Avaya Inc. v. Cisco Sys., Inc.*, Civil Action No. 10-5881 (FLW), 2011 WL 4962817, at *2 (D.N.J. Oct. 18, 2011). Instead, as noted above, the Court will simply apply Rule 26 to the discovery disputes at issue here, like it does in any other case. It will therefore ask whether the discovery sought relates to "any nonprivileged matter that is

relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).

- As to what is *not* relevant trade secret discovery: what BSC is not entitled to do is to set out a claim in Count IX for trade secret misappropriation—i.e., a claim involving a certain set of alleged facts, occurring in a certain alleged time frame, involving a certain referenced set of persons and a certain type of purported misconduct—and then say to Nevro, "Now that we have plausibly pleaded *that type* of trade secret misappropriation claim, we would like discovery regarding whether you may have taken *any other action*, even action *not related to the core of the facts and allegations set out in Count IX*, that we might consider to *also* amount to trade secret misappropriation." That would be a "fishing expedition" that would not seek documents that are actually relevant to Count IX. *Zuk v. E. Pa. Psychiatric Inst. of the Med. Coll. of Pa.*, 103 F.3d 294, 299 (3d Cir. 1996); *see also Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) ("The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim. . . . That the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not justify the discovery request[.]") (emphasis omitted).

- So what *is* relevant trade secret discovery? One easy answer relates to the District Court's decision regarding the motion to dismiss. Therein, the District Court clearly concluded that the SAC plausibly alleges that the content of the Confirmatory Study and the Module Specification are trade secrets that were misappropriated. (D.I. 23 at 23-24) So if there is a dispute about whether requested discovery is otherwise permissible as to Count IX, and if BSC can sufficiently articulate how the content of the requested discovery *relates to the content of those two documents*, the discovery is surely relevant and will be permitted.

- Beyond that, the Court does not agree with Nevro that BSC is necessarily limited to taking discovery *only* relating to the content of those two documents. *See Vesta Corp.*, 147 F. Supp. 3d at 1154 (recognizing that in some trade secret cases, plaintiffs "may face an inherent difficulty identifying what portions of trade secrets have been misappropriated prior to receipt of discovery from defendants" such as cases where the defendant "stole large volumes of documents or secrets from

15

> [the p]laintiff without [p]laintiff's knowledge"). Indeed, the facial scope of Count IX is broader than those two exemplary instances of misappropriation. That Count alleges that Mr. Thacker—sometime between after he arrived at Nevro in 2009, up through the point to when Nevro developed its own SCS system (i.e., the "relevant time period" regarding the claim, which the Court understands to have ended by mid-2010, as set out above)—"[o]n *multiple occasions* . . . disclosed [BSC's] confidential, proprietary information to Nevro"—with the Confirmatory Study and the Module Specification being two *examples* of "disclosed" documents containing such trade secrets. (D.I. 48 at ¶¶ 194, 197, 202 (emphasis added))

- Therefore, if there is an irreconcilable dispute about whether other requested discovery is relevant to Count IX, BSC will be able to obtain that discovery if it can thereafter credibly explain to the Court why the subject matter: (1) relates to the misappropriation that occurred during the relevant time period described in the claim (2009 to mid-2010); (2) concerns misappropriation of "research and development, product development plans, manufacturing plans and methods, clinical investigations, patient data, programming specifications, marketing and sales force plans, product component lists, product specifications and diagrams, and budgetary, financial, and cost data" and/or content found in materials that Mr. Thacker allegedly took with him from BSC (i.e., the "five . . . laboratory notebooks" or BSC "thumb drives" or "Precision[] demonstration devices" or "Physician lead manuals" or "Physician implant manuals" or "Precision[] media kits" referenced in the claim), (*id*. at ¶¶ 191-93); and (3) concerns the type of misappropriated material that was "proprietary" to BSC (or not generally known to others who could obtain economic value from it) during the relevant time frame, (*id*. at ¶¶ 182-83, 192; *see also* D.I. 23 at 21).

With the above guidance now provided, the Court DENIES WITHOUT PREJUDICE the remainder of BSC's motion and DENIES WITHOUT PREJUDICE Nevro's motion for a protective order. The Court ORDERS the parties to further meet and confer regarding this dispute. In that regard, the Court notes that BSC is asserting that it is entitled to Nevro documents and information relating to the 64 purported trade secrets that it says were misappropriated and that are subsumed within the allegations in Count IX. But while the parties

have had some back-and-forth about these 64 categories, they have not provided the Court with the tools to determine whether any single category (if disputed) should or should not fairly be the subject of discovery.

Moreover, as a further guide to the parties, the Court will address BSC's Trade Secret No. 1, just by way of example. That purported trade secret is described as "[p]roprietary and confidential functional tests to be performed to validate functionality in various hypothetical scenarios; including functional tests to be performed on paddle lead obturator to establish that paddle obturator meets design input and performance requirements and including functional tests to be performed on SCS II system to validate functional changes to proprietary software." (D.I. 115, ex. F at 3) If the parties hereafter cannot agree on whether BSC is entitled to discovery on this topic after a further meet and confer, then BSC will bear the burden to show the Court why this material is relevant to the allegations in Count IX. Count IX does not specifically mention "functional tests to be performed on paddle lead obturator" or "functional tests to be performed on SCS II system to validate functional changes to proprietary software."[10] So it is not as if the Court can simply look at the content of Count IX and the text of the purported trade secrets and

---

[10]  In the Court's view, it is exceedingly unlikely that BSC is going to be able to demonstrate that a description of a purported trade secret as general as "functional tests to be performed to validate functionality in various hypothetical scenarios" is sufficient to show that relevant discovery regarding such subject matter should be permitted. (D.I. 115, ex. F at 3) BSC is almost certainly going to have to be more specific than that. Therefore, as to this purported trade secret, it is only the more specific material (the material that comes after the word "including") that is likely to matter. Thus, the Court focuses on those more specific indicators herein: "functional tests to be performed on paddle lead obturator" or "functional tests to be performed on SCS II system to validate functional changes to proprietary software."

Similarly, in the future, if BSC is going to point the Court to documents that are said to demonstrate that certain purported trade secrets fall within the ambit of Count IX, it will need to be specific in its citations to those documents. It will not be sufficient, for example, for BSC to simply reference a document number, without any explanation of what specific material in that document BSC asserts to amount to a trade secret that is being referenced in Count IX.

determine that that material falls within the ambit of the claim. Now, it might nevertheless be the case that such tests *are* rightly understood to be subsumed within Count IX's references to "research and development" or "product development plans" that were "proprietary" to BSC in the relevant time frame (and that were allegedly stolen by Mr. Thacker from BSC). But BSC would have to provide a record to allow the Court to understand *why this is so*. Only then would the Court have a basis to conclude that these two types of functional tests are indeed relevant to Count IX's allegations. If BSC could not do that, the Court would not permit it to obtain discovery on this topic from Nevro.

To the extent that the parties do not resolve their disputes about the 64 purported trade secrets at issue, then they may again utilize the Court's discovery dispute procedures and bring those disputes before the Court. By no later than **August 31, 2020**, the parties shall provide the Court with a joint status report, of no more than three single-spaced pages, regarding their efforts to reach agreement as to these disputes (including as to a proposal for teeing up any individual remaining disputed issues with the Court in a manageable way).[11]

## IV. CONCLUSION

The Court therefore orders that the parties' discovery disputes shall be resolved as set out above.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the document. Any such redacted version shall be

---

[11] The Court also DENIES BSC's request to impose sanctions against Nevro. (D.I. 155 at 3-4) As the Court explained above, it does not agree with BSC that Nevro waived the objections discussed herein to BSC's trade secret discovery. And it does not believe that any of Nevro's other objected-to conduct warrants imposition of sanctions.

18

submitted by no later than **August 26, 2020** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: August 21, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE