# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORP. and BOSTON SCIENTIFIC NEUROMODULATION CORP., <br><br> Plaintiffs and Counter-Defendants, <br><br> v. <br><br> NEVRO CORP., <br><br> Defendant and Counterclaimant. | ) ) ) ) ) ) ) ) ) Civil Action No. 16-1163-CFC-CJB ) CONSOLIDATED ) ) ) ) ) ) |

## MEMORANDUM ORDER

Presently pending before the Court are the parties' discovery disputes regarding trade secret discovery. (*See* D.I. 331; D.I. 375)[1] The Court[2] has considered the parties' letter briefs, (D.I. 341; D.I. 344), and the parties' arguments made during the September 23, 2020 teleconference, ("Tr."). It ORDERS that the disputes be resolved in the manner set out below.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The Court here writes primarily for the parties, who are well familiar with the discovery disputes relating to Plaintiffs Boston Scientific Corp. and Boston Scientific Neuromodulation Corp.'s ("Plaintiffs" or "BSC") trade secret claim (which is set out in Count IX of the operative

---

[1]   These disputes originally arose in Civil Action No. 18-644-CFC-CJB ("Nevro II"). On June 22, 2020, the District Court consolidated Civil Action No. 16-1163-CFC-CJB ("Nevro I") and Nevro II. (Civil Action No. 18-644-CFC-CJB, June 22, 2020 Oral Order) All citations herein, unless otherwise noted, are to the docket in Nevro I.

[2]   Nevro I and Nevro II have been referred to the Court to hear and resolve discovery disputes and protective order disputes. (Aug. 7, 2020 Docket Entry; Civil Action No. 18-644-CFC-CJB, D.I. 51 at 9)

Second Amended Complaint ("SAC")).  In its August 21, 2020 Memorandum Order ("August 21 MO"), the Court provided an overview of the relevant background regarding BSC's and Defendant Nevro Corp.'s ("Defendant" or "Nevro") continuing disputes regarding trade secret discovery; the Court incorporates that summary herein by reference.  (D.I. 326 at 1-4)  The Court will only set out additional background facts as needed, in light of the current case posture.

The August 21 MO first addressed the parties' disputes regarding certain specific interrogatories and requests for production of documents propounded by BSC on February 10, 2020 in connection with its trade secret claim (the "February 2020 Discovery Requests").  (*Id.* at 6-13; *see also* Civil Action No. 18-644-CFC-CJB, D.I. 114, exs. A-B)  In connection with these disputes, the Court had to determine what is the relevant time period relating to BSC's trade secret claim (the "relevant time period")—such that requests for discovery that sought information from outside of this time period would be deemed presumptively not relevant, absent the parties' agreement otherwise or some further order of the Court.  Based on the record before it at the time, the Court concluded that the relevant time period "is the date in 2009 when [James] Thacker joined Nevro (whenever that is) to the time period when Nevro developed its own [spinal cord stimulation, or 'SCS'] system (which the Court understands, from the record before it, to be May 2010)."  (D.I. 326 at 8)

In addition to resolving disputes regarding specific February 2020 Discovery Requests, the Court provided guidance on the parties' overarching dispute about whether BSC has sufficiently identified 64 purported trade secrets that it says were misappropriated and thus are subsumed within Count IX's allegations.  (*Id.* at 13-18)  The parties were ordered to further meet and confer on the issue in light of this guidance; to the extent they could not resolve their

2

disputes about these 64 purported trade secrets, they were ordered to utilize the Court's discovery dispute procedures. (*Id.*)[3]

On August 31, 2020, the parties submitted a joint status report regarding three issues that remain in dispute with respect to BSC's trade secret discovery. (D.I. 331) First is the parties' lingering dispute regarding the appropriate "relevant time period" to govern such discovery. (*Id.* at 2-3) Second is the parties' continuing dispute about whether BSC has sufficiently identified the 64 trade secrets at issue. (*Id.* at 1-2) To that end, BSC suggested that the Court provide its views "concerning the level of detail provided in [BSC's] Supplemental Disclosure [], which the parties will then use as a guide for the remaining 60 trade secrets." (*Id.* at 1) Third, the parties explained that they had a dispute regarding Nevro's trade secret document production, with Nevro withholding production based on its position that each of BSC's document requests requires further identification of the trade secrets at issue. (*Id.* at 3) The Court thereafter set telephonic argument for September 23, 2020, ordered the parties to submit supplemental letter briefs regarding the first two issues, and indicated that the Court would address the third issue during the teleconference. (D.I. 333)

BSC submitted its supplemental letter brief on September 9, 2020, (D.I. 341), and Nevro submitted its supplemental letter brief on September 16, 2020, (D.I. 344). The Court heard

---

[3]  By way of further background about this issue, after Nevro objected to the February 2020 Discovery Requests for, *inter alia*, failing to set out the particular trade secrets at issue, BSC identified these 64 purported trade secrets in an Initial Disclosure of Trade Secrets ("Initial Disclosure"). (Civil Action No. 18-644-CFC-CJB, D.I. 115, ex. F) Nevro disputed the sufficiency of BSC's Initial Disclosure, and provided, by way of illustrative example, an explanation as to why BSC's identification of four of the 64 trade secrets (Trade Secrets Nos. 2, 10, 47 and 56) were deficient. (*Id.*, ex. G) On May 29, 2020, BSC served a Supplemental Disclosure for Trade Secrets Nos. 2, 10, 47 and 56 ("Supplemental Disclosure") that included additional details and evidentiary citations. (Civil Action No. 18-644-CFC-CJB, D.I. 161 at 4; Civil Action No. 18-644-CFC-CJB, D.I. 162, ex. B; *see also* D.I. 332; D.I. 341 at 1)

argument from the parties on September 23, 2020. ("Tr.") Thereafter, on September 29, 2020, without first seeking leave from the Court, Nevro filed another letter regarding these disputes, in which it, *inter alia*, made a new proposal as to how the Court might resolve them. (D.I. 358) Because the letter did not follow the Court's discovery dispute procedures, and because Nevro had not sufficiently met and conferred about the letter's content with BSC, the Court struck the letter; it further ordered the parties to meet and confer regarding Nevro's new proposal. (D.I. 360) The parties did so and submitted a status report on October 9, 2020, in which it was reported that BSC did not agree to Nevro's proposal. (D.I. 371) Thus, the Court advised the parties that it would proceed to resolve the instant disputes. (D.I. 372)

## II.     STANDARD OF REVIEW

The Court incorporates by reference the legal principles regarding relevant discovery, and limits to discovery, set out in the August 21 MO. (D.I. 326 at 4-5)

## III.    DISCUSSION

The Court will first address the relevant time period issue, and will then turn to whether BSC has sufficiently identified Trade Secrets Nos. 2, 10, 47 and 56.

### A.     The Relevant Time Period

As described above, the Court recently concluded that the relevant time period for trade secret discovery is the date in 2009 when Mr. Thacker joined Nevro through May 2010 (i.e., the date by which Nevro had developed its first SCS system). (D.I. 326 at 8) For the following reasons, however, the current record demonstrates that the relevant time period for trade secret discovery should be modified to be December 2008 through May 2015.

As for the starting point of the relevant time period, it appears that Mr. Thacker was employed by Nevro first as a consultant in December of 2008 and then as a full-time employee

4

beginning on January 1, 2009.  (Tr. at 11, 19; D.I. 341, ex. A)  The SAC alleges that "[o]n multiple occasions, *while employed by Nevro*, Mr. Thacker disclosed Boston Scientific's confidential, proprietary information to Nevro."  (Civil Action No. 18-644-CFC-CJB, D.I. 48 (hereinafter, "SAC") at ¶ 194 (emphasis added))  Thus, it is reasonable for the time period to begin in December 2008.

And as for the right ending point, May 2015 is when Nevro launched its first SCS product in the United States.  (D.I. 341 at 1-2 & ex. D at 18-20; Tr. at 10, 22-23)  The SAC alleges that during "the relevant time period" for the claim, Nevro was "developing its own SCS ['Senza'] system, and conducting its own clinical investigations."  (SAC at ¶ 197)  The Court now understands that there is no dispute that Nevro was conducting pivotal clinical trials (i.e., "clinical investigations") and related work up through its first U.S. product launch in 2015.  (D.I. 341, ex. D at 18-20; Tr. at 29)  And the SAC alleges that Mr. Thacker took over 34,000 files that included proprietary data regarding BSC's clinical investigations (as well as "research and development, product development plans, manufacturing plans and methods . . . patient data, programming specifications, marketing and sales force plans, product component lists, product specifications and diagrams, and budgetary, financial, and cost data").  (SAC at ¶ 192)

In opposing a time period extending up through May 2015, Nevro reads the SAC as alleging that the only relevant time period is that during which Nevro was conducting its "initial development" with respect to the Senza product, and that accordingly, the only "clinical investigations" relevant to BSC's trade secrets claim are any that occurred before Nevro's Senza product received CE Mark approval in Europe in 2010 (i.e., Nevro's "first clinical

5

investigation"). (D.I. 344 at 2; Tr. at 25, 27-28, 70-71)[4]  But the Court agrees with BSC that the SAC's trade secret allegations are not limited to the "first" such clinical investigation, and it is plausible that information that Mr. Thacker took from BSC regarding "clinical investigations" could have been utilized throughout the entire clinical development program for Nevro's SCS product through May 2015. (Tr. at 44-45; D.I. 331 at 2-3; D.I. 341 at 2)  Therefore, the Court agrees with BSC that—now that BSC has provided the Court with a more robust record that makes this clear—the proper relevant time period for trade secret discovery is December 2008 through May 2015.[5]

      **B.**      **BSC's Trade Secrets Nos. 2, 10, 47 and 56**

---

[4]      According to the record before the Court, the only "clinical investigation" that BSC undertook prior to CE Mark approval in 2010 was a single clinical trial: a one-week United States feasibility clinical trial. (D.I. 341, ex. D at 18; Tr. at 45-46)

[5]      When Nevro previously raised the issue of the relevant time period in connection with an earlier discovery dispute, BSC should have then specifically explained *why* the SAC's allegations warranted a time period that extended beyond May 2010. (D.I. 333; Tr. at 7) At the time, BSC was arguing that the relevant time period was up through the filing of the original complaint in 2018 in the Nevro II action. But BSC did not then provide a good explanation as to why that 2018 date made sense, either in light of SAC's allegations or the current record. (Tr. at 7-8; *see also* D.I. 326 at 7 & n.8; D.I. 344 at 3; Civil Action No. 18-644-CFC-CJB, D.I. 165 at 9-11, 35-36) Despite BSC's prior failure in this regard, the Court provided the parties an additional opportunity to brief this issue. That is because with regard to a hotly-contested claim like this, which potentially spans many years and could implicate a significant amount of document discovery, establishing the right temporal limitation for discovery is particularly important. (*See, e.g.*, Tr. at 43)

      In that vein, the Court again notes that the relevant time period as defined herein (December 2008 through May 2015) is a presumptive one, which, absent the parties' agreement otherwise or further order of the Court, shall govern Nevro's discovery responses and Nevro's production of documents with respect to BSC's trade secret discovery requests. If, during the course of discovery, BSC learns about documents created in or relating to a date that falls outside of this time period, but which BSC believes are clearly relevant to Count IX, it can of course raise the issue with Nevro. If Nevro disagrees with BSC's position, the parties may utilize the Court's discovery dispute procedures to address the issue. (*See id.* at 12-13, 38-39)

The Court next addresses whether BSC's Trade Secrets Nos. 2, 10, 47 and 56 are sufficiently specific. As a general matter, BSC's Supplemental Disclosure with respect to these trade secrets clearly adds a great amount of detail, as compared to what was provided in BSC's Initial Disclosure. The Initial Disclosure described each trade secret in one broad sentence, while the Supplemental Disclosure begins with a similarly broad sentence, but then adds additional language to further describe the trade secret at issue. (*Compare* Civil Action No. 18-644-CFC-CJB, D.I. 115, ex. F, *with* D.I. 332, ex. A; *see also* Tr. at 89) Indeed, BSC has explained that the first sentence of each trade secret in the Supplemental Disclosure "is provided for context, with the specific details following" and that it "would be willing to delete the first sentence of each" trade secret. (D.I. 341 at 3 n.3; *see also* Tr. at 56-57, 59)[6]

With respect to BSC's Supplemental Disclosure, the Court ordered BSC to provide its view as to how the four trade secrets at issue are not only described in a sufficiently specific way, but also how they: (1) relate to the misappropriation that occurred in the relevant time period described in the claim; (2) concern the subject matter described in the SAC and/or in materials taken by Mr. Thacker; and (3) concern information then regarded by BSC as proprietary. (D.I. 333) The Court will assess each trade secret in turn.

        1.        **Trade Secret No. 2 ("TS2")**

TS2 is based on information set out in a qualification test protocol ("QTP") meant to ensure and demonstrate the accurate operation of an SCS system. (D.I. 341 at 3 & ex. F) The QTP is one of the 34,000 documents taken by Mr. Thacker, and it concerns BSC's information relating to "research and development . . . programming specifications . . . [and] product

---

[6] The parties may meet and confer on the issue, with Nevro indicating whether or not it would find it helpful for BSC to delete the first sentence of each trade secret in the Supplemental Disclosure. (D.I. 341 at 3 n.3; Tr. at 59)

specifications[.]" (SAC at ¶ 192; *see also* D.I. 341 at 3)  The SAC further alleges that at least Mr. Thacker (and thereby Nevro) acquired Boston Scientific's trade secrets by improper means; that "[o]n multiple occasions, while employed by Nevro, Mr. Thacker disclosed Boston Scientific's confidential, proprietary information to Nevro[;]" and that Nevro has "used the information provided by Mr. Thacker in connection with its business activities, including in its research and development, design, clinical investigation, and testing of the Senza Systems." (SAC at ¶¶ 194, 197, 202)  And BSC has sufficiently explained (at this juncture) that the information constituting TS2 was and is proprietary to it.[7]  The QTP itself bears a "confidential" label instructing that the information therein may not be disclosed without "prior written permission[.]"  (D.I. 341, ex. F)

     Nevro claims that BSC's Supplemental Disclosure still fails to specify what testing methods BSC is claiming to be a misappropriated trade secret because the description of five testing methods is "exemplary" and "merely recite[s] the names of various test scenarios[.]" (D.I. 344 at 3-4)  With respect to Nevro's first complaint, BSC's counsel confirmed that the use of the term "includes" in the Supplemental Disclosure is not intended to allow for additional undescribed test methods to fall within the ambit of the trade secrets.  (*See* Tr. at 58-59)[8]  And with respect to Nevro's second complaint, the Supplemental Disclosure clearly does more than merely recite the name of various test scenarios.  It goes on to describe what the specific scenarios are meant to verify.  (D.I. 332, ex. A at 1)

---

       [7]     Nevro may of course later challenge on the merits whether or not BSC's purported trade secrets actually amount to such under the law.  *See, e.g.*, *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1013 (N.D. Cal. 2018) (considering on summary judgment whether plaintiff's asserted trade secrets were publicly available or widely known in a given industry).

       [8]     This applies to each of the four trade secrets at issue.

8

During the teleconference, Nevro raised a new concern with respect to BSC's Supplemental Disclosure, using TS2 as an example. Nevro's counsel pointed out that one of the cited pages of the QTP at issue in TS2 describes a test to "verify input of patient demographics" and recites as one step (among others) to "[p]ower on the [c]linician's [p]rogrammer." (D.I. 341, ex. F at BSC-NEVRO-DE0008346 (*cited in* Tr. at 75)) According to Nevro, this simple individual step cannot itself be said to be a trade secret, yet it is ambiguous as to whether BSC is claiming that it is. (Tr. at 75-76) Nevro's counsel then acknowledged that if it is the combination of steps that amounts to the purported trade secret, "that would at least narrow it a little bit." (*Id.* at 88) The Court, however, does not understand how it could be viewed in any other way. Another step in this test, for example, is to "[c]lick [o]k." (D.I. 341, ex. F at BSC-NEVRO-DE0008346) There is no way that BSC could be claiming that that step, in isolation, amounts to a trade secret. It has to be the substance of the combination of steps described in the QTP that amounts to BSC's asserted trade secret, and the Court interprets TS2 in that way.

Another complaint that Nevro raised during the teleconference is that taking all of BSC's purported trade secrets together, they cover "every aspect of an SCS system, basically" such that, for example, the trade secrets relating to testing methodologies, taken together, "would eventually amount to every testing document that Nevro has." (Tr. at 86-87) But there are at least two responses to that line of attorney argument that prevent it from having an impact on the Court's task here. One, Nevro has not made any record to support the argument. In the absence of such a record, the Court has no real way of knowing whether the claim is true. (*Id*. at 87)[9]

---

[9] In any event, the concern seems like it would go more to the issue of what amount of discovery regarding TS2 would be unduly burdensome or expensive to produce pursuant to Federal Rule of Civil Procedure 26(b), not whether the trade secret at issue had been sufficiently identified.

9

Two, while it seems that, taken together, BSC's purported trade secrets likely cover a lot of information, that does not seem surprising, in light of BSC's allegation that Mr. Thacker took over 34,000 files spanning numerous categories of information relating to an SCS system. (SAC at ¶ 192; *see also* Tr. at 42, 90-91)

For these reasons, and after incorporating the modification set out above, in the Court's view BSC has identified TS2 with sufficient specificity.

### 2.     Trade Secret 10 ("TS10")

TS10 is based on information set out in a BSC document describing guidelines for the functional assessment of cochlear implant systems. (D.I. 341 at 3 & ex. G) BSC explains that the techniques described in the document "confirm key aspects" of operability to be utilized by personnel involved in the clinical management of implant systems. (*Id.* at 3-4; D.I. 332, ex. A at 1) This document was one of the 34,000 documents taken by Mr. Thacker, and it includes BSC's information relating to "clinical investigations," "programming specifications" and "sales force plans[.]" (D.I. 341 at 3-4; SAC at ¶ 192) The SAC further alleges that at least Mr. Thacker (and thereby Nevro) acquired Boston Scientific's trade secrets by improper means; that "[o]n multiple occasions, while employed by Nevro, Mr. Thacker disclosed Boston Scientific's confidential, proprietary information to Nevro[;]" and that Nevro has "used the information provided by Mr. Thacker in connection with its business activities, including in its research and development, design, clinical investigation, and testing of the Senza Systems." (SAC at ¶¶ 194, 197, 202) And BSC has sufficiently explained (at this juncture) that the information constituting TS10 is proprietary to it. The document serving as the basis for TS10 itself bears a "confidential" designation instructing that it not be disseminated outside of the company. (D.I. 341, ex. G)

Nevro argues that BSC's Supplemental Disclosure with respect to TS10 remains deficient for a few different reasons.

First, Nevro asserts that TS10 fails to "identify any specific 'materials or methods for training' or 'functional assessments of implantable stimulation systems'" that BSC claims are misappropriated trade secrets, and that BSC's language merely constitutes "restatements of titles of various sections of the document." (D.I. 344 at 4) But this ignores the actual content of the disclosure. BSC's Supplemental Disclosure (particularly the second paragraph describing TS10) names particular tests at issue and identifies what it is about those tests that amount to BSC's trade secrets. (D.I. 332, ex. A at 1-2)

Next, Nevro asserts that BSC fails to show how the document at issue here regarding cochlear stimulation products (which Nevro does not offer) relates to misappropriation of BSC's trade secrets to aid in the development of Nevro's first SCS system. (D.I. 344 at 5) But the document relates to devices that are implanted, as are SCS devices. And Mr. Thacker took the document with him from BSC. This all makes BSC's retort—that there is overlapping information and technology that is relevant to both types of devices—a plausible one. (Tr. at 61-63)

Finally, during the teleconference, Nevro also contended that certain cited material in the document at issue describing the purportedly proprietary electric field imaging ("EFI") test "talks about Ohm's law, which is basic electrical theory, basic physics." (*Id.* at 81)[10] This leads to ambiguity, according to Nevro, with respect to what exactly BSC is claiming to be its trade

---

[10] Nevro also previously raised this concern to BSC in connection with the parties' meet and confer regarding BSC's Initial Disclosures. (Civil Action No. 18-644-CFC-CJB, D.I. 115, ex. G at 2)

secret. (*Id.*) It is true that the document includes a subsection that "cover[s] the basic electrical theory that is vital for understanding the EFI[,]" including a reference to "ohms." (D.I. 341, ex. G at BSC-NEVRO-DE0008832-33) And BSC's Supplemental Disclosure does include "the theory behind EFI" as being encompassed in its TS10. (D.I. 332, ex. A at 2) It is not clear to the Court how "basic electrical theory" would constitute a BSC trade secret (though it may be that BSC does not mean to be asserting this in TS10). The parties shall further meet and confer on this issue in an attempt to resolve it.

But otherwise, aside from the basic electrical theory issue, BSC has identified TS10 with sufficient specificity.

### 3. Trade Secret 47 ("TS47")

TS47 is based on information set out in BSC documents describing a Functional Specification for designing an SCS device. (D.I. 341 at 4-5 & exs. H, I) These documents "cover[] numerous aspects of an SCS product, including not only the way the device operates, but also product safety requirements and cost information." (*Id.* at 4 & exs. H-I; Tr. at 66-67) These documents were two of the 34,000 documents taken by Mr. Thacker, and they include BSC's information relating to "research and development . . . programming specifications . . . [and] product specifications[.]" (SAC at ¶ 192; *see also* D.I. 341 at 4)[11] The SAC further alleges that at least Mr. Thacker (and thereby Nevro) acquired Boston Scientific's trade secrets by improper means; that "[o]n multiple occasions, while employed by Nevro, Mr. Thacker disclosed Boston Scientific's confidential, proprietary information to Nevro[;]" and that Nevro has "used the information provided by Mr. Thacker in connection with its business activities,

---

[11] BSC contends that the information disclosed in the two documents serving as the basis for TS47 is the "same sort of information as that described in the 'Module Specification,'" cited in the SAC." (D.I. 341 at 4; *see also* SAC at ¶ 201)

12

including in its research and development, design, clinical investigation, and testing of the Senza Systems." (SAC at ¶¶ 194, 197, 202) And BSC has sufficiently explained (at this juncture) how the information constituting TS47 is proprietary to it. The documents serving as the basis for TS47 themselves bear a "confidential" designation instructing that they not be distributed without "prior express written consent." (D.I. 341, exs. H-I)

Nevro, in response, argues that BSC's Supplemental Disclosure fails to provide any additional detail as to what specific information regarding an SCS device's hardware and software constitutes BSC's misappropriated trade secrets. (D.I. 344 at 5) The Court does not agree. Here again, the second paragraph of BSC's disclosure describes the specific components of an SCS device referenced in the functional specification documents that constitute BSC's trade secrets (and further, what about those components amounts to BSC's trade secret information). (D.I. 332, ex. A at 2-3)

Nevro also complains that TS47 claims as a trade secret the "'physical description'" of the components making up an SCS system "when this information could have been obtained merely by purchasing a BSC device." (D.I. 344 at 5) But whether one could see that a component had a certain physical attribute after purchase is one thing. It is another thing to know that internally, BSC felt it crucial that the component have that attribute (and why), or that BSC had certain (undisclosed) requirements relating to that attribute that led to the component looking the way it did.

For these reasons, in the Court's view, BSC has identified TS47 with sufficient specificity.

    **4.**    **Trade Secret 56 ("TS56")**

TS56 is based on information set out in a BSC document providing an "Updated [] Summary Report" of a clinical study designed to investigate a new method of fitting SCS patients. (D.I. 341 at 5 & ex. J) This document was one of the 34,000 documents taken by Mr. Thacker, and it includes BSC's information relating to "research and development . . . clinical investigations, [and] patient data[.]" (SAC at ¶ 192; *see also* D.I. 341 at 5) The SAC further alleges that at least Mr. Thacker (and thereby Nevro) acquired Boston Scientific's trade secrets by improper means; that "[o]n multiple occasions, while employed by Nevro, Mr. Thacker disclosed Boston Scientific's confidential, proprietary information to Nevro[;]" and that Nevro has "used the information provided by Mr. Thacker in connection with its business activities, including in its research and development, design, clinical investigation, and testing of the Senza Systems." (SAC at ¶¶ 194, 197, 202)

However, BSC has not provided the Court with any information to allow it to understand how the document was proprietary and confidential, i.e., that it derived value because it was not generally known to the public and that BSC took reasonable steps to keep it secret. *See Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1111 (N.D. Cal. 2016) (citing Cal. Civ. Code § 3426.1(d)). The document at issue does not bear a "confidential" designation or other similar indicia on its face. (D.I. 341, ex. J) And BSC has not presented a declaration or other similar evidence to provide the Court with some other reasonable basis to understand how this is so. *Cf. Lilith Games (Shanghai) Co. v. uCool, Inc.*, Case No. 15-CV-01267-SC, 2015 WL 4149066, at *5 (N.D. Cal. July 9, 2015). BSC's counsel just says it is so, (D.I. 341 at 5; Tr. at 64-65), which is insufficient. For this reason, the Court does not now have a sufficient record to understand

14

how TS56 is relevant to Count IX (i.e., how it is encompassed by the trade secrets referenced in that Count).[12]

### C. Conclusion

BSC has alleged a plausible trade secret claim in this litigation. And BSC has attempted to get its case with respect to that claim underway, serving the February 2020 Discovery Requests over eight months ago. It is time for discovery to get going on this claim. On that front, in light of the Court's decisions above, the parties shall meet and confer and agree on a date by which production of documents relating to TS2, TS10 and TS47 shall be completed. The parties shall further meet and confer with respect to how the Court's guidance regarding the four trade secrets at issue here shall be applied to the remaining 60 trade secrets, as well as to BSC's Requests for Production Nos. 1-56. (*See* D.I. 331 at 3) To the extent the parties have lingering disputes after meeting and conferring, they shall utilize the Court's discovery dispute procedures. Lastly, the parties shall submit a joint status report on these subjects, of no more than three single-spaced pages, by no later than **October 29, 2020**.

## IV. CONCLUSION

The Court therefore orders that the parties' trade secret discovery disputes shall be resolved as set out above.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly

---

[12] Additionally, during the teleconference, BSC's counsel explained that the underlying methodology of the clinical study is proprietary, but the "results of course [are] not[.]" (Tr. at 64-66) The Supplemental Disclosure in the first paragraph describes the trade secret as including "the analysis" of the results of the study, while the second paragraph references "analysis of *and results* from the study[.]" (D.I. 332, ex. A at 3 (emphasis added)) To the extent TS56 is claiming that the results themselves are proprietary, BSC's counsel seemed to back off of that claim during the teleconference. Accordingly, the results themselves could not constitute a part of TS56.

proposed, redacted version (if necessary) of the document.  Any such redacted version shall be submitted by no later than **October 22, 2020** for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure."  *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).  The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated:  October 19, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE